[No. H030940. Sixth Dist. Sept. 12, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
EUGENE WILSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., and IV. under the heading DISCUSSION.

COUNSEL

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McADAMS, J.—Defendant Eugene Wilson was charged with 11 counts alleging various sex crimes against three girls (S., P., and F., ages seven, 12, and 11, respectively, at the times of the incidents). A jury convicted defendant of one count of aggravated sexual assault on S. by penetration with a foreign object (Pen. Code, §§ 269, 289 subd. (a)),[1] one count of aggravated sexual assault on S. by oral copulation (§§ 269, 288a), two counts of lewd and lascivious conduct against S. by force, violence, duress, menace, or fear (§ 288, subd. (b)(1)), one count of lewd and lascivious conduct against S.

---

[1] All further statutory references are to the Penal Code, unless otherwise stated.

(§ 288, subd. (a)), one count of lewd and lascivious conduct against F. (§ 288, subd. (a)), and three counts of lewd and lascivious conduct against P. (§ 288, subd. (a)). The jury acquitted defendant of one count of lewd and lascivious conduct against F. (§ 288, subd. (a)) and one count of lewd and lascivious conduct against P. (§ 288, subd. (a)). The jury found true allegations that defendant committed specified acts against more than one victim (§ 667.61, subds. (b), (e)) and that he committed two of the offenses by the use of force, violence, duress, menace or fear within the meaning of section 1203.066, subdivision (a)(1). The court sentenced defendant to 75 years to life in prison.[2]

In the published portion of the opinion, we address defendant's contention that the trial court erred when it instructed the jury with a modified version of CALCRIM No. 1191 and told the jury that it could use evidence of a charged offense to infer that defendant was disposed to or inclined to have the requisite specific intent for other charged crimes. We conclude the court did not err when it instructed the jury with this modified version of CALCRIM No. 1191.

In the unpublished portion of the opinion, we address defendant's contentions that the court erred by instructing the jury with CALCRIM No. 1080 because it inaccurately stated the law pertaining to oral copulation and that there was insufficient evidence to establish the element of oral copulation necessary to support his conviction for aggravated sexual assault by oral copulation. We also address defendant's argument that his convictions for lewd and lascivious conduct on counts 9 through 11 must be reversed because there is insufficient independent evidence apart from his own statements to satisfy the corpus delicti rule and defendant's request to correct an error in the probation report because the trial court's order relating to the error was not implemented correctly. We find no error with regard to the first three issues, conclude that the fourth issue is moot, and affirm the judgment.

FACTS

I. *Prosecution Case*

The three girls (S., P., and F.), N. (the mother of S. and P.; hereafter Mother), and three police officers testified at trial. In addition, the jury saw a videotape of Detective Scott Simpson interviewing defendant, in which defendant confessed to some of the charges. Our discussion of the evidence is organized chronologically by event and by victim.

---

[2] The sentence was based on a sentence of 15 years to life on count 1 and sentences of 15 years to life, consecutive to count 1, on counts 2, 5, 6, and 9. The court sentenced defendant to 15 years to life on counts 3 and 4 and stayed the sentences on counts 3 and 4 pursuant to section 654. The court also imposed concurrent 15-year-to-life sentences on counts 10 and 11.

Defendant lived with his girlfriend, Mother, and her three children, S., P., and D. (a boy) in Sunnyvale, California. F. was P.'s friend; she lived around the corner from P.

### A. Incident with F. in Pool in August 2004 (Count 6)

In August 2004, when F. was 11 years old, she attended a birthday party for P. at a hotel with a swimming pool. The guests included Mother's three children (P., D., and S.), F., and F.'s two brothers. Defendant, Mother, and other adults were also at the party. Defendant was playing with the children in the pool. He picked up the children, threw them into the air, and threw them into the water. The children were wrestling with defendant and each other.

F. was wearing a two-piece bathing suit. F. told the jury that while wrestling with defendant, she felt defendant slip his hand down the front of her bathing suit bottom and touch her vagina with his hand. He did not try to penetrate her with his finger. He was behind her and left his hand there for a few seconds. She tried to swim away. It was hard to get away because he was strong and he was holding her around the waist. F. eventually broke free and swam to the side of the pool. She did not tell anyone about what had happened until after defendant was arrested.

F. testified she never thought the incident in the pool was an accident. F. knew it was not an accident because defendant's hand was there for "quite a while" and it made her feel scared. F. knew the difference between good touching and bad touching because she had been touched in a sexual way by her uncle when she was four years old and when she was seven years old. F. testified that the prior molestations made her afraid of men.

The jury convicted defendant of one count of lewd and lascivious conduct arising out of this incident.

### B. Incident with F. When She Spent the Night in August 2004 (Count 7)

Some time in August 2004, after the incident in the pool, F. spent the night at P.'s house. She slept in the queen bed that P. shared with S. F. testified that defendant came into the girls' room and touched her on the leg and on the rear end. F. explained that defendant was carrying S. into the room and touched her as he placed S. in the bed between P. and F. F. could not recall

what part of her leg he touched. He squeezed her leg, then placed his hand on her rear end and did not let go for a few seconds. She was under the covers and defendant's hand was on top of the covers. F. did not know whether defendant had touched her accidentally. She assumed it was not accidental because defendant had touched her inappropriately before in the pool.

In closing argument, defendant argued that F. was distrustful of incidental, nonsexual contact with men because of the prior molestation by her uncle. The jury acquitted defendant of the charges arising out of this incident.

### C. *Incidents in P.'s Bedroom in October 2004 (Counts 8–11)*

P. testified that around Halloween 2004, when she was 12 years old, she woke up one morning and told her mother that she had dreamt that defendant was in her room the night before with a beer in his hand. In her dream, she saw defendant touching her leg. She woke up and saw defendant leaving her room. After she told her mother about the dream, her mother asked defendant if he had been in P.'s room. P. did not know what defendant's response was. P. told Detective Eric Fujii that it felt like defendant was kneeling down beside her and then she opened her eyes.

On cross-examination, P. testified that she did not know what part of her story was real and what part was a dream. She confirmed that she had not told the police officers that defendant touched her. She said it was a dream and in her dream defendant touched her knee or the lower part of her leg.

Detective Scott Simpson interviewed defendant in February 2005. The interview was videotaped and the prosecution played the videotape for the jury. In the interview, defendant stated that he touched P.'s vagina when she was asleep one night about three months prior to the interview. He said it happened in October, around Halloween. Defendant said he pulled down her pants and her underwear and "felt on her hairs." He touched her vagina but did not insert his finger into her vagina. He stated that she was sleeping and did not know that he had touched her. Defendant told the officer that he went into her room and touched her three or four times the same night. The last time he touched her, she woke up, told him to "get out," and went back to sleep. He thinks he was excited when he touched her.

Mother testified that P. told her about a dream in October 2004. Mother discussed the dream with P. and P. said she dreamt defendant was by her bed. Mother asked P. whether defendant had touched her and she said "no." Mother did not "put much stock into" P.'s story because it was not unusual for defendant to be in the girls' room. He went in there regularly at night to shut off the lights, the television, and the videogame or to close the curtains. Mother did not discuss P.'s story with defendant.

The prosecutor charged defendant with four counts of lewd and lascivious conduct (§ 288, subd. (a)) arising out of this incident. The jury found defendant guilty of three counts and not guilty of the fourth count.

### D. *Incident with S. in December 2004 (Count 5)*

In December 2004, S. was six years old. S. slept in "Pull-Ups" brand training pants because she occasionally wet the bed. When defendant got home from work on the night in question, he found Mother and S. asleep in the bed that he shared with Mother. Defendant got into bed, between S. and Mother.

Mother testified that later that night, she felt the bed moving and heard the crinkle of the Pull-Ups. She jumped up, pulled back the covers, and asked defendant "Are you touching [S.]?" She did not see anything and defendant denied doing anything to S.

Detective Simpson questioned defendant about the December 2004 incident with S. Defendant told the detective that he put his hands inside S's training pants and touched her vagina and her "butt." He heard Mother wake up and pulled his hand out of the training pants. Defendant did not know why he touched S. He said Mother was "acting a little crazy" that night so he did not want to touch Mother. S. was asleep and did not know what happened.

After the incident, Mother told him to leave. He told Mother he had nowhere to go and begged her to let him stay. He apologized and promised never to do it again. He left for a couple of days and returned.

The jury found defendant guilty of the charges arising out of this incident.

### E. *Incident with S. in February 2005 (Counts 1–4)*

On February 26, 2005, S. told Mother that defendant had molested her that day. Mother called the police and defendant was arrested.

The following evidence is based on the testimony of Officer Hendry regarding her interview with S. on the date of the incident. S. told Officer Hendry that she fell asleep watching television in her bed. She woke up when defendant carried her to the living room couch. S. told the officer that defendant was wearing boxer shorts. S. told the officer defendant pulled his boxers down to his calves, pulled down S.'s pants and underwear, climbed on

top of S., took his penis into his hand and rubbed it across her lips and face. S. showed the officer what defendant had done with her fist. As she did so, she pinched her lips tightly together. S. said defendant's penis touched her lips. S. told the officer that defendant rubbed her private parts with his fingers. S. said his penis was "long and hard and . . . stuck out." S. said that defendant turned her over onto her stomach and rubbed his penis between her legs and that she tried to get up but could not because defendant kept pushing her down.

Detective Simpson discussed S.'s allegations with defendant when he interviewed defendant on the night of the incident. Defendant told the detective that Mother was napping that afternoon because she had worked two shifts in 24 hours. Both P. and D. were out of the house; S. was the only child at home. Defendant wanted to make love to Mother but she told him to wait for an hour. He watched television, then had sex with Mother.

Defendant told Detective Simpson that he did some things he should not have done. Defendant explained that after he made love to Mother, he went into S.'s room and touched her between her legs, over her clothes. He then told S. to go into the living room. She walked to the living room. Defendant decided to go into the living room because he thought Mother might wake up and did not want to be seen. Defendant told S. to unbuckle and pull down her pants. She unzipped her pants and pulled down her underwear. He unzipped his pants and exposed himself to her. He told the detective he touched her vagina with his fingers. His fingers could not go inside her because they were too big. He was excited; he wanted to have sex with her but could not get erect. Defendant also stated that he had her lay on top of him on the couch with her clothes on and that he turned her over and touched her rear end. Defendant denied having intercourse with S., penetrating her vagina with his fingers, rubbing his penis on her face or placing his penis by her mouth. Defendant told the officer that S. sat on his leg at one point. He asked her if she was going to tell and she said "no."

Defendant told the detective that he left the room to check on Mother, then went back to living room to touch S. some more. When he returned, S. was hiding under the air hockey table in the living room. Defendant took S. to the store.

Mother testified that she heard S. tell defendant that she was going to tell on him. S. came into Mother's room and told her what had happened. As S. was talking, defendant interrupted, saying the accusations were not true and " 'I'm a bad person. Please don't call my mom.' "

S.'s testimony at trial was inconsistent with what she told the police and with her testimony at the preliminary hearing. Prior to the preliminary hearing in August 2005, S. told her mother that some of the things she had told the police were not true. At trial, S. testified that defendant touched her private parts on February 26, 2005. She recalled him coming into her room, but testified that he did not touch her over her clothes in her room. At trial, she stated that she walked into the living room and that defendant did not carry her. Defendant told her to pull down her pants and she did. S. told the jury that although she told the police officer that defendant had pulled down his boxers, he did not do that. She sat on his lap and he touched her private parts with his hand. At the preliminary hearing, S. testified that defendant had put his finger inside her vagina about half an inch. At trial, she testified that he did not put his fingers in her private parts. S. explained that at the time of the preliminary hearing, she felt she had to answer when asked whether defendant's fingers went inside her, even though she did not remember or did not know whether that was true. She also told the jury she was telling the truth at the preliminary hearing. S. stated that she had told the police officer that defendant had taken his penis in his hand, rubbed it across her face, and tried to put it in her mouth. But at trial, she testified that he did not put his penis on her face or in her mouth. S. acknowledged telling the officers that defendant had turned her over and held her down. But at trial, she said he did not turn her over or hold her down. At trial, she testified that defendant's penis was soft, not hard, and that she both did and did not see his penis.

S. told the jury that she did not like defendant and made up the "really bad stuff" to get him in trouble. S. did not want defendant to be with Mother. She wanted Mother to get back together with her father. She wanted Mother to get mad at defendant, so he would get out of the house. There was evidence that Mother had some sex tapes in her room. S. told the jury she watched some of the tapes when Mother was not at home and that some of them showed men putting their penises in someone else's mouth.

The jury found defendant guilty of the charges arising out of this incident.

F. *Defendant's Letters*

After he was arrested and while in custody, defendant sent Mother some letters in which he discussed the case in detail and set forth how he wanted the girls to testify. Mother gave the letters to the police. Defendant wrote: "All [S.] got to do is say [']no['] I did not touch her . . . in her room and I will say . . . I did not touch her in the room . . . so they cannot charge me

with that one. Make sure you tell [S.] to just say [']no['] to everything they ask except that I touched her in the living room one time only. I will say one time in the living room." In another letter, he admitted touching S. in both the bedroom and the living room. In another, he wrote, "He said all the jury wants to hear is ['N]o he did not do that.['] [S.] just has to say [']no['] to oral copulation and the charge will be dropped. . . . [A]nd I really did not do oral copulation, as God is my witness." Mother testified that defendant asked her to say she was mistaken about the incident in bed with S. in December 2004. In one letter, defendant asked Mother to tell the jury that her daughter has not told the truth. Mother did not discuss defendant's letters with S. because she wanted S. to forget everything, she "wanted it to just go away in her mind."

## II. *Defense Case*

Defendant did not testify and elected to rely on the state of the evidence.

## DISCUSSION

## I. *Propensity Instruction (Modified Version of CALCRIM No. 1191)*

Defendant contends the trial court erred when it instructed the jury with a modified version of CALCRIM No. 1191, which advised the jury that it could use evidence of a charged offense to infer that defendant was disposed to or inclined to have the requisite specific intent for other charged crimes.

### A. *Factual and Procedural Background*

#### 1. *Evidence of Defendant's Intent*

We begin by summarizing the evidence regarding defendant's intent at the time he committed each of the offenses. With regard to the offenses involving S. and P., there was evidence relating to defendant's mental state at the time he committed the offenses. During the police interview, defendant told Detective Simpson that he was excited when he touched P. in October 2004 and when he touched S. in February 2005. With regard to the February 2005 incident with S., defendant told the officer that he was "probably" still "horny" after having sex with Mother and that he wanted to have sex with S. Although defendant did not admit to being excited when he touched S. in bed in December 2004, there was evidence from which the jury could infer a sexual intent. Defendant said Mother was "acting crazy" at the time and he

therefore did not want to touch Mother. There was no direct evidence regarding defendant's mental state with regard to the offenses involving F. because those offenses did not come to light until after the police interviewed defendant. Consequently, Detective Simpson did not ask him about them.

### 2. *CALCRIM No. 1191 and the Modified Version Used in This Case*

At the time of the trial, CALCRIM No. 1191 provided: "The People presented evidence that the defendant committed the crimes[3] of ____ <*insert description of offense[s]*> that were not charged in this case. These crimes are defined for you in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit ____ <*insert charged sex offense[s]*>, as charged here. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of ____ <*insert charged sex offense[s]*>. The People must still prove each element of the charge beyond a reasonable doubt. [Do not consider this evidence for any other purpose [except for the limited purpose of ____ <*insert other permitted purpose, e.g., determining the defendant's credibility*>].]"

The court instructed the jury with the following modified version of CALCRIM No. 1191: "The People presented evidence that the defendant committed the crimes of Aggravated Sexual Assault Of a Child Under 14 and 10 Or More Years Younger Than The Defendant; Lewd Or Lascivious Act On A Child By Force, Violence, Duress, Menace Or Fear; and Lewd Or Lascivious Act On A Child Under Fourteen. These crimes are defined for you in these instructions. [¶] If you decide that the defendant committed a charged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to have the requisite specific intent for

---

[3] For the sake of readability, we used the language from CALCRIM No. 1191 that refers to the uncharged offenses in the plural.

other charged crimes, and based on that decision also conclude that the defendant was likely to and did have the requisite specific intent for other charged offenses. If you conclude that the defendant committed a charged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the other charged offenses. The People must still prove each element of every charge beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the specific intent of the defendant in certain charged offenses."

### 3. Proceedings in the Trial Court Regarding Modified Instruction

Defendant objected to use of the modified version of CALCRIM No. 1191 on the ground that it was "more prejudicial than probative of any particular fact that the jurors may consider" under Evidence Code section 352. He argued that the incidents involving S. and F. were separate and distinct, since the incident with S. occurred while no one else was around, while the incidents with F. occurred at a public pool and in a bedroom where the other girls were present. He also argued that the offenses in each case were different and that it was overly confusing to allow the jury to consider what happened with S. and P. to determine defendant's specific intent with regard to F.

The district attorney argued that the modified instruction was not confusing. He stated that while the modified instruction was based on Evidence Code section 1108, it was not "strictly beholden" to section 1108 and that it increased the prosecution's burden of proof because the jurors have to find the defendant guilty of the other offenses beyond a reasonable doubt before they can consider the propensity evidence to prove specific intent.

Defendant disagreed with the assertion that the modified instruction raised the prosecution's burden of proof and argued that if one of the counts is insufficient in regard to specific intent, the jury can infer intent from a "completely separate incident" involving another victim under other conditions, thereby lowering the prosecution's burden of proof.

The court observed that the modified instruction omitted the language in the pattern instruction permitting proof of the uncharged offenses by a preponderance of the evidence. It concluded that "these offenses can be used as circumstantial evidence to prove one of the other offense[s]" and that this is what the modified Evidence Code section 1108 instruction does. The court analyzed the admissibility of the propensity evidence under Evidence Code section 352 and held that the evidence was "more probative than prejudicial" and "necessary."

### B. *Parties' Contentions on Appeal*

Citing *People v. Quintanilla* (2005) 132 Cal.App.4th 572 [33 Cal.Rptr.3d 782] (*Quintanilla*),█ defendant argues that it was error to instruct the jury that it could infer criminal propensity with regard to one offense from evidence of other charged offenses and that evidence of charged offenses (as contrasted with uncharged offenses) cannot be used in this manner. He contends the error violated his due process rights because it diminished due process protections requiring proof beyond a reasonable doubt and lightened the prosecution's burden of proof.

The Attorney General argues that *Quintanilla* was incorrectly decided and is distinguishable. He asserts that charged offenses can be used to show propensity and the instruction did not deprive defendant of his due process rights.

### C. *General Rules Regarding Admissibility of Character and Propensity Evidence*

 We begin our analysis by reviewing the statutory scheme and case law regarding the admissibility of character and propensity evidence. "As a general rule, evidence that is otherwise admissible may be introduced to prove a person's character or character trait. ([Evid. Code,] § 1100.) But, except for purposes of impeachment (see [Evid. Code,] § 1101, subd. (c)), such evidence is inadmissible when offered by the opposing party to prove the defendant's conduct on a specified occasion ([Evid. Code,] § 1101, subd. (a)), unless it involves commission of a crime, civil wrong or other act and is relevant to prove some fact (e.g., motive, intent, plan, identity) *other than a disposition to commit such an act* ([Evid. Code,] § 1101, subd. (b))."[4] (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*).)

The Legislature has created exceptions to this rule in cases involving sexual offenses (Evid. Code, § 1108) and domestic violence (Evid. Code,

---

[4] Evidence Code section 1101 provides in pertinent part: "(a) Except as provided in this section and in Section[] . . . 1108, . . . , evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, *intent*, preparation, plan, knowledge, identity, . . . , or whether a defendant in a prosecution for an unlawful sexual act . . . did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." (Italics added.)

§ 1109). Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

"[T]he Legislature enacted section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases." (*Falsetta, supra*, 21 Cal.4th at p. 911.) "Available legislative history indicates section 1108 was intended in sex offense cases to relax the evidentiary restraints section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility . . . . [¶] . . . 'Our elected Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence. The Legislature has determined the need for this evidence is 'critical' given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial." (*Ibid.*) "[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Id.* at p. 915.)

The defendant in *Falsetta* was convicted of forcible oral copulation and assault with intent to commit rape. He challenged the admissibility of evidence regarding two prior assaults, which had occurred seven and nine years before the charged offenses, on due process grounds. In both of the prior cases, the defendant had pleaded guilty to rape. (*Falsetta, supra*, 21 Cal.4th at pp. 908, 909–910.) The court rejected the defendant's due process challenge and concluded that evidence of uncharged sexual offenses may be admitted under Evidence Code section 1108 to show that the defendant had a disposition or propensity to commit such crimes. (*Falsetta, supra*, 21 Cal.4th at pp. 915, 918.)

The court stated: "the trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from defendant's due process challenge." (*Falsetta, supra*, at p. 917.) "By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352. Rather than admit or

exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra,* at pp. 916–917; see also *People v. Harris* (1998) 60 Cal.App.4th 727, 737–740 [70 Cal.Rptr.2d 689].)

*Falsetta* observed that propensity evidence " ' "is [deemed] objectionable, not because it has no appreciable probative value, *but because it has too much.*" ' " (*Falsetta, supra,* 21 Cal.4th at p. 915.) The court discerned three reasons supporting the general rule against the admission of propensity evidence: "The rule of exclusion (1) relieves the defendant of the often unfair burden of defending against both the charged offense and the other uncharged offenses, (2) promotes judicial efficiency by avoiding protracted 'mini-trials' to determine the truth or falsity of the prior charge, and (3) guards against undue prejudice arising from the admission of the defendant's other offenses." (*Id.* at pp. 916–917.)

### D. *Jury Instructions on Propensity Evidence*

*Falsetta* authorized the admission of evidence of *uncharged* sex offenses under Evidence Code section 1108 to prove that the defendant had a disposition to commit sex offenses. Since defendant alleges instructional error, we turn to case law addressing the propriety of jury instructions based on Evidence Code section 1108 and the analogous provision in Evidence Code section 1109, which authorizes the admission of propensity evidence in domestic violence cases.

In *People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1013 [130 Cal.Rptr.2d 254, 62 P.3d 601] (*Reliford*), our Supreme Court held that the 1999 version of CALJIC No. 2.50.01, an instruction that explained the application of Evidence Code section 1108, correctly stated the law. The court rejected the defendant's contentions that the instruction was likely to mislead the jury concerning the limited purpose for which it may consider other-crimes evidence and the prosecution's burden of proof. (29 Cal.4th at pp. 1009, 1012.) The court held that the 2002 revision of the instruction, which deleted one sentence and

added another, was "an improvement." (*Id.* at p. 1016.) We have set forth the text of the 2002 revision of CALJIC No. 2.50.01 in the margin.[5]

"The version of CALJIC No. 2.50.01 considered in *Reliford* is similar in all material respects to . . . CALCRIM No. 1191 . . . in its explanation of the law on permissive inferences and the burden of proof." (*People v. Schnabel* (2007) 150 Cal.App.4th 83, 87 [57 Cal.Rptr.3d 922], fn. omitted.)

Court of Appeal cases have followed *Falsetta* and *Reliford* and upheld the constitutionality of Evidence Code section 1109 (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310–1313 [97 Cal.Rptr.2d 727]; *People v. Price* (2004) 120 Cal.App.4th 224, 240 [15 Cal.Rptr.3d 229]), which authorizes the use of propensity evidence in domestic violence cases, and the corresponding CALJIC instruction, CALJIC No. 2.50.02 (*People v. Pescador* (2004) 119 Cal.App.4th 252, 261–262 [14 Cal.Rptr.3d 165]). The Court of Appeal has also held that for the purpose of evaluating the constitutional validity of the instructions, there is no material difference between CALJIC No. 2.50.01 and CALJIC No. 2.50.02. (*People v. Escobar* (2000) 82 Cal.App.4th 1085, 1097, fn. 7 [98 Cal.Rptr.2d 696].)

*Falsetta*, *Reliford*, and the Evidence Code section 1109 cases cited above involved the admission of prior *uncharged* sex offenses or incidents of domestic violence to show a propensity to commit the sex offenses or domestic violence offenses at issue in the case. In this case, defendant challenges the court's instruction, which told the jury that it can rely on propensity evidence from one or more sex offenses that were charged in the same case to determine whether defendant had the requisite intent to commit another *charged* sex offense.

In *Quintanilla, supra*, 132 Cal.App.4th 572, the case defendant cites, the court disapproved of an instruction that permitted the jury to draw a

---

[5] The 2002 version of CALJIC No. 2.50.01 provided in part: "Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense [on one or more occasions] other than that charged in the case. [¶] . . . [¶] If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that [he] [she] was likely to commit and did commit the crime [or crimes] of which [he] [she] is accused. [¶] However, if you find by a preponderance of the evidence that the defendant committed [a] prior sexual offense[s], that is not sufficient by itself to prove beyond a reasonable doubt that [he] [she] committed the charged crime[s]. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime."

propensity inference from other charged domestic violence offenses.[6] The trial court in *Quintanilla* gave the following modified version of CALJIC No. 2.50.02: " 'Evidence has been introduced for the purpose of showing that the defendant engaged in . . . domestic violence on more than one or more occasions . . . . [¶] . . . [¶] If you find that the defendant committed a prior offense involving domestic violence on one or more occasions, you may but are not required to infer that he was likely to commit . . . the crimes of which he is accused that involve domestic violence, such as injuring a cohabitant, false imprisonment, assault or making threats of death or great bodily injury. You may not draw the inference that the defendant is likely to commit any other crimes charged in this trial. However, if you find by a preponderance of the evidence that the defendant committed . . . multiple acts involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed . . . any charged domestic violence offenses. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider along with all other evidence in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged . . . domestic violence offenses. Thus, in the commission of a prior act, domestic violence is not sufficient by itself to prove beyond a reasonable doubt that the defendant committed any charged offense. The weight and significance of separate incidents of domestic violence, if any, are for you to decide.' [¶] . . . [¶] 'Within the meaning of the preceding instruction regarding inferences of a disposition to commit domestic violence, the prosecution has the burden of proving by a preponderance of the evidence that . . . the defendant committed . . . multiple domestic violence offenses. You must not . . . draw an inference of a disposition to commit domestic violence unless you find by a preponderance of the evidence that the defendant committed . . . acts of domestic violence on separate occasions.' " (*Id.* at p. 581, boldface omitted.)

The defendant argued that the trial court's discretion to exclude propensity evidence under Evidence Code section 352 was the crucial factor in meeting due process requirements under *Falsetta* and that he had no opportunity to object under Evidence Code section 352 because the other-crimes evidence was admitted to prove the other charges against him. (*Quintanilla, supra*, 132 Cal.App.4th at pp. 581–582.) The Court of Appeal concluded that the trial court erred by modifying CALJIC No. 2.50.02 to permit the jury to draw a propensity inference from other *charged* domestic violence offenses. The

---

[6] The prosecutor in *Quintanilla* dismissed one of the domestic violence charges for lack of evidence that the parties lived together when the conduct at issue took place and the jury acquitted the defendant of a second domestic violence charge. (*Quintanilla, supra*, 132 Cal.App.4th at p. 576.) The defendant was convicted of false imprisonment, inflicting injury on a cohabitant, forced sexual penetration, witness intimidation, assault with force likely to cause great bodily injury, criminal threats and rape arising out of events on a third occasion. (*Id.* at p. 575.)

court stated that Evidence Code "[s]ection 1109 was clearly intended to make evidence of uncharged domestic violence admissible in cases where it was not previously permitted. [Citation.] The Legislature was careful to provide that evidence of other domestic violence offenses may be excluded when it is unduly prejudicial. Our Supreme Court relied heavily on a parallel provision in [Evidence Code] section 1108 when it upheld the constitutionality of that statute, which was the first to authorize the admission of propensity evidence. (*People v. Falsetta, supra,* 21 Cal.4th at pp. 917–918.) Evidence of other charged offenses cannot be excluded, however, no matter how prejudicial it may be. Without that safeguard, it is fundamentally unfair to allow the jury to infer the defendant's propensity to commit crimes of domestic violence from his commission of other charged offenses." (*Quintanilla,* supra, 132 Cal.App.4th at pp. 579–580.)

The court concluded: "Given our Supreme Court's emphatic reliance on the trial judge's ability to exclude unduly prejudicial propensity evidence as a component of due process, we are reluctant to stretch section 1109 beyond its intended purpose to authorize instructions that permit the jury to draw an inference of criminal propensity from evidence pertaining to other charged offenses, which cannot be excluded under section 352." (*Quintanilla, supra,* 132 Cal.App.4th at p. 582.) In *Reliford,* the court rejected the argument that the burden of proof instructions in CALJIC No. 2.50.01, which tell the jury to apply the preponderance standard to a prior or uncharged offense and the reasonable doubt standard to the charged offense, were unduly confusing. (*Reliford, supra,* 29 Cal.4th at p. 1016.) The *Quintanilla* court acknowledged the holding in *Reliford,* but concluded there was a danger of confusion in the case before the court because that case involved only charged offenses, not the interplay between charged and uncharged offenses. (*Quintanilla,* at p. 583.) The court expressed concern over the "mental gymnastics" involved in evaluating the "charged offenses under the preponderance standard for purposes of drawing a propensity inference, while also weighing the same evidence under the reasonable doubt standard for purposes of deciding [the defendant's] guilt on each charge." (*Ibid.*) Although the court concluded that the instruction at issue was erroneous, it held that the error was not prejudicial. (*Ibid.*)

The concurring justice in *Quintanilla,* who concluded that the instruction was not erroneous, observed: "There is no reason why the same factors that the court must consider in determining whether to exclude evidence under [Evidence Code] section 352 cannot be considered in determining whether to give an instruction . . . permitting consideration of the evidence to show propensity or, alternatively, to give an instruction . . . limiting consideration of the evidence to the offense to which it directly relates. If the court

determines that the particular evidence would be admissible under [Evidence Code] section 352 if the offense with respect to which it is offered as propensity evidence were tried separately, then an instruction such as CALJIC No. 2.50.02 is appropriate. If under [Evidence Code] section 352 the evidence is not cross-admissible, such an instruction should not be given." (*Quintanilla, supra*, 132 Cal.App.4th at p. 586 (conc. opn. of Pollak, J.).)

Citing *Quintanilla*, defendant argues that it was error to instruct the jury that it could infer criminal propensity with regard to one offense from evidence of other charged offenses. As we explain below, we conclude the instruction and the situation presented here are distinguishable from the instruction and the situation in *Quintanilla*.

### E. *Propriety of Modified Instruction Given in This Case*

■ We discern three reasons for permitting the jury to use evidence of charged sex offenses to show a propensity to commit another charged offense. First, the plain wording of Evidence Code section 1108 does not limit its application to cases involving uncharged sex offenses. The statute provides that when a "defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." The statute does not distinguish between charged and uncharged offenses. Second, in cases such as this, involving multiple sexual offenses against multiple victims, permitting the jury to use propensity evidence in this way serves the legislative purpose behind section 1108. Third, the policy concerns or factors that *Falsetta* described as "supporting the general rule against the admission of propensity evidence" are not implicated where multiple offenses are charged in the same case. (*Falsetta, supra*, 21 Cal.4th at p. 915.) The defendant does not face an "unfair burden of defending against both the charged offense and the other uncharged offenses" or "protracted 'mini-trials' to determine the truth or falsity of the prior charge" or "undue prejudice arising from the admission of the . . . other offenses" in cases such as this, since he is already required to defend against all of the charges. (*Id.* at pp. 915, 916.) Thus, the reasons for excluding propensity evidence set forth in *Falsetta* do not apply to cases involving propensity evidence based on charged offenses.

For these reasons, we are not persuaded that the court in *Quintanilla* was correct in precluding the use of charged offenses to show propensity. But we need not resolve that broader question, since the instruction in this case is much narrower than and distinguishable from the instruction given in *Quintanilla*.

■ The court crafted the modified CALCRIM No. 1191 instruction at issue here very narrowly. First, it eliminated the language permitting proof of

the propensity evidence by a preponderance of the evidence. The court instructed the jury that the prosecution needed to prove "each element of every charge beyond a reasonable doubt." There were no other instructions that permitted proof by any standard other than beyond a reasonable doubt. Thus, there was no risk that the jury would be confused regarding the standard of proof or apply the wrong standard of proof. Second, like the instruction approved in *Reliford*, the court instructed the jury that it may, but was not required to make the inference authorized by Evidence Code section 1108. Third, it told the jurors that the inference "is not sufficient by itself to prove that the defendant is guilty of the other charged offenses." Fourth, it limited use of the inference to proof that defendant had the specific intent to commit a charged offense. Finally, prior to giving the modified instruction in this case, the court engaged in the weighing process that our Supreme Court found crucial for the admission of propensity evidence in *Falsetta*, and weighed the propriety of using evidence of one offense as circumstantial evidence to prove one of the other offenses under Evidence Code section 352. (*Falsetta, supra*, 21 Cal.4th at pp. 917–918.)

■ As we noted above, under the instruction at issue here, evidence of other charged offenses could be used only for the limited purpose of proving defendant's specific intent. The use of charged offenses in this manner comports with the use of charged offenses under Evidence Code section 1101, subdivision (b), which authorizes the use of evidence of other acts of misconduct to prove some fact other than the defendant's disposition to commit a criminal act, "such as motive, opportunity, intent." In *People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442], a case involving multiple crimes against three separate victims on separate occasions, the court stated, "evidence of each assault could be used under Evidence Code section 1101, subdivision (b), to show [the] defendant's mental state for each other assault, namely his intent." In summary, use of other crimes evidence is permitted under Evidence Code section 1101, subdivision (b) to prove the defendant's intent and applies in cases involving both charged offenses and uncharged offenses.

For all these reasons, we conclude that the court did not err when it instructed the jury with the modified version of CALCRIM No. 1191 set forth above.

II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1034.

DISPOSITION

The judgment is affirmed.

Mihara, Acting P. J., and Duffy, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 10, 2008, S167451.