Filed 3/8/13  P. v. Moreland CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D058995 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS233770) |
| GEORGE MORELAND, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Defendant George Moreland was convicted of multiple counts of violent sexual assault on two victims Moreland lured into his truck under the guise of hiring them to clean his house.  The trial court sentenced Moreland to a total of 295 years in prison and imposed a $10,000 restitution fine.

On appeal, Moreland contends the trial court erred in admitting evidence of an uncharged offense and in instructing the jury that it could consider the charged offenses

as evidence of his propensity to commit sex crimes. Moreland also argues the trial court erred in admitting the recording of a 911 call from one of the victims and in imposing the restitution fine.

We find no error with respect to admission of evidence of the uncharged crime. Although we do find the trial court gave a somewhat confusing instruction with respect to use of each charged crime as proof of the other crime, the confusion, if any, was not prejudicial. We find no error in admission of the 911 recording and imposition of the restitution fine. Accordingly, we affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Prior Uncharged Offense*

In November 1997, Moreland was the manager of a San Diego County Radio Shack store. Around noon one day, an 18-year-old woman named Stacy walked into the store, where Moreland was working alone. While Stacey was looking at speakers in the back of the store, Moreland grabbed her from behind, put his hands over her mouth and dragged her to a storage room. Stacey kicked and screamed. She also had an involuntary bowel movement.

In the storage room, Moreland bound Stacey's hands with plastic zip ties. Stacey begged Moreland to let her go. In response, Moreland tried to cover her mouth with duct tape and threatened to kill her. When she kept begging him to let her go, Moreland grabbed Stacey's throat and again threatened to kill her.

After Moreland bound Stacey and threatened her, he left the storage room and locked the front door to the store. When he returned to the storage room, he smelled

2

Stacey's bowel movement; he then led her to a bathroom, where first he tried to clean her and then untied her and let her clean herself. He asked Stacey her name and verified her answer by looking in her purse and finding her driver's license.

Moreland told Stacey he was sorry and could not believe what he was doing, and that she was "so beautiful." Moreland told her he would give her anything she wanted. While Stacey was telling Moreland she really just wanted the bracelet she had been wearing, they heard a loud alarm in the store. Moreland went out of the storeroom, came back and said, "Oh no" or "Oh shit." Moreland then told Stacey to "be a friend." Stacey went out of the storeroom and saw what seemed to her to be 20 police officers who had broken down the front door.

As a result of the assault on Stacey, Moreland pled guilty to kidnapping with intent to commit a sexual offense and was imprisoned. Moreland was released from prison in 2002.[1]

2. *F.*

On July 6, 2009, Moreland was driving a white truck in Bonita and approached two female residents of Tijuana, F. and her friend J. F. and J. were walking to jobs as house cleaners in the area. Moreland asked the women if they would work for him. J.

---

[1]    At trial, the trial court arranged for Stacey to testify in the jury lounge rather than in its courtroom because anxiety and claustrophobia Stacey suffered following Moreland's attack on her made it difficult for Stacey to go upstairs and into the courtroom. The trial court made this arrangement without explaining to the jury its reasons for doing so and instead simply stated on the record that the courtroom was not available on the day of Stacey's testimony.

declined the offer, but F. agreed. Moreland instructed F. to meet him at 9:00 a.m. the following day at a nearby Vons grocery store.

As planned, the following morning Moreland met F. at the Vons and she got in his truck. Moreland drove for about 25 minutes to his house. F. noticed that outside Moreland's house there was a tree with a small horse, like a swing, hanging. Once they were inside the house, Moreland showed F., who does not understand English very well, where the cleaning supplies were and motioned to her about what he wanted cleaned.

F. began cleaning a small bedroom. Moreland came into the bedroom and motioned for her to go into the living room. When they were in the living room, Moreland, using a combination of words, gestures, and a drawing, asked F. to take off her blouse. When F. refused, Moreland pulled out a knife and threatened her with it. In response, F. took off her blouse. Moreland used the knife again to compel F. to take off her pants, her bra, and her underwear.

Moreland then sat on the couch and forced F. to orally copulate him. Moreland then took F. to a bedroom, where he undressed and ordered her to lie down on a bed. On the bed he touched, kissed and licked her breasts. Moreland then forced F. to again orally copulate him while he penetrated her vagina with his fingers and slapped her buttocks.

Next, Moreland forced F. to kneel on two pillows on the floor and orally copulate him. Moreland attempted to ejaculate in F.'s mouth, but she was able to turn her head away and Moreland ejaculated on her chest.

4

Moreland cleaned himself, dressed and permitted F. to clean and dress herself. He then took F. to the San Ysidro border, gave her $200 and told her he would see her on the following Friday afternoon with another $200.

At various points during the attack on F., in addition to using a knife to threaten F., Moreland grabbed F.'s hands and pulled her towards him, grabbed her head and forced her to orally copulate him, and tried to force her mouth open so that he could ejaculate in it. At one point, he told her she was "beautiful."

Instead of going across the border into Mexico, F. called 911 and reported she had been sexually assaulted. The recording of her 911 call, in which she repeatedly breaks down crying, was played for the jury. During the course of investigating the assault, DNA was retrieved from the semen on F.'s face and chest, and it matched DNA retrieved from a sample provided by Moreland.

F. was able to identify Moreland in a photo lineup and recalled he had a snake tattoo on his upper right arm. After Moreland was identified as her assailant, investigators drove F. to his house. As the investigators turned off Jamacha Road and onto Jalisco Road, near Moreland's house, F. became very emotional and said, "This is it. This is it."

F. was also able to identify one of the knives found in Moreland's home as the knife with which Moreland threatened her.

Following Moreland's attack on her, F. gave up cleaning houses.

3. *E.*

About three months later, on October 1, 2009, Moreland approached E., another resident of Tijuana, as E. was walking up a hill in Chula Vista. Using words and gestures, Moreland offered E. $100 to clean his house. E. agreed and got into his truck.

According to E., Moreland drove for about 25 minutes before reaching his house. As E. was putting down her purse on the living room couch, Moreland gestured as if he were taking off his shirt and pointed at E. E. said no, and in response, Moreland took out a knife from his pocket and threatened E. with it. Although E. attempted to resist, Moreland took off both her shirt and bra. He then began touching her breasts.

Moreland then pulled down E.'s pants, and when he did so, she reached into her underwear and retrieved a sanitary napkin. Moreland took off E.'s pants and underwear and bent her over a small table, where he rubbed his penis against her buttocks and attempted to penetrate her anus.

Next, Moreland forced E. to kneel down and orally copulate him. E. cried and told Moreland she did not want to perform oral sex on him. Moreland ignored E.'s statements and, while holding the knife in one hand, he used his other hand to move her head.

Moreland then took E. to a bedroom where he again made her kneel and orally copulate him while she was crying. Moreland ejaculated on E.'s face and then cleaned her face with a towel. Moreland then directed E. to the living room.

6

E. got dressed and Moreland drove her back to the location in Chula Vista where he initially approached her. Before E. got out of the truck, Moreland put some rolled-up money in her hands.

E. walked to a friend's house and told her friend, Lupita, what had happened. Because E. was afraid she would lose her visa, E. told Lupita not to call the police. Lupita called a second friend, Roxana.

Roxana picked E. up and took E. to Roxana's house. Roxana noticed that E. was upset and kept crying and crying; Roxana also noticed that E.'s blouse was stained. E. took a shower and Roxana gave her a sleeping pill. When E. woke up, she discovered that Lupita's son had called police. Roxana then drove E. to a nearby police station.

4. *Trial and Sentence*

Moreland was arrested and charged with multiple counts of forcible oral copulation (Pen. Code,[2] § 288a, subd. (c)(2)), two counts of false imprisonment (§§ 236 & 237, subd. (a)), one count of forcible sexual penetration (§ 289), and one count of attempted forcible sodomy (§§ 664/286). The district attorney made related allegations that the oral copulation offenses were committed against more than one victim and that Moreland personally used a deadly weapon. (§§ 667.61, subds. (b), (c) & (e), 12022.3, subd. (a).)

At trial, Moreland testified he believed that F. and E. consented to the sex acts he performed.

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

7

The jury acquitted Moreland of one count of forcible oral copulation and convicted him on the remaining counts; the jury also found true the multiple victim and weapons allegations. The trial court sentenced Moreland to serve 295 years to life in prison.

DISCUSSION

I.

By way of a motion in limine, Moreland sought an order preventing admission of evidence of his assault on Stacey. After conducting a hearing on the motion, the trial court denied the motion and permitted Stacey to testify. In his first argument on appeal, Moreland contends the trial court erred in denying his motion. We find no error. Stacey's testimony was admissible under the provisions of Evidence Code section 1108.

A. *Legal Principles*

Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." As the court in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*) stated, Evidence Code section 1108 was enacted to "expand the admissibility of disposition or propensity evidence in sex offense cases. . . . [¶] . . . [S]ection 1108 was intended in sex offense cases to relax the evidentiary restraints section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility. In this regard, section 1108 implicitly abrogates prior

8

decisions of this court indicating that 'propensity' evidence is per se unduly prejudicial to the defense. [Citation.]" (*Falsetta*, at p. 911.)

In sum, "the Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes. [Citation.]" (*Falsetta*, *supra*, 21 Cal.4th at p. 915.)

Importantly, "[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." (*People v. Frazier* (2001) 89 Cal.App.4th 30, 41, fn. omitted; see also *Falsetta, supra*, 21 Cal.4th at p. 916.) However, under Evidence Code section 352, a trial court must nonetheless determine whether admission of a prior sex crime is unduly prejudicial. "By reason of section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under section 352. Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden

9

on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations]." (*Falsetta*, *supra*, 21 Cal.4th at pp. 916-917.)

We review the trial court's ruling on admission of evidence of a prior sex crime under an abuse of discretion standard. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

B. *Analysis*

Admission of Moreland's assault on Stacey falls squarely within the confines of Evidence Code section 1108. It was a sex crime in which, like the charged crimes, he attacked a woman who was a stranger to him, restrained her, moved her to an isolated location and forced her to disrobe. Because the prior crime showed a propensity to commit sex crimes, it fell within the overall intent of the statute. However, the fact that the prior act shows a propensity to commit sex crimes does not end our analysis. (*Falsetta, supra*, 21 Cal.4th at pp. 916-917.) We must also review the trial court's determination that the evidence was not barred by Evidence Code section 352.

As the trial court noted, in important respects there was substantial similarity between all three crimes: they all involved moving and isolating adult women, substantial physical contact in restraining them, and threats of grave harm or death. The similarity in the crimes made the prior act highly relevant and probative with respect to the credibility of F. and E. and their testimony that they did not consent to any of the sex acts Moreland performed. In light of Moreland's conviction with respect to the attack on

Stacey, there was no doubt as to the certainty the attack occurred or any risk the jury would feel a need to punish Moreland for the prior offense. Because the charged crimes occurred only seven years after Moreland was released following his attack on Stacey, the attack on Stacey was in no sense too remote to be relevant. (Compare *People v. Wesson*, *supra*, 138 Cal.App.4th at p. 970 [14-year-old uncharged act not too remote] with *People v. Branch* (2001) 91 Cal.App.4th 274, 284 [30-year-old uncharged act not too remote].) Moreover, because Stacey was rescued by police before Moreland was able to complete any sex acts on her, the circumstances of the prior crime were not any more inflammatory than the repeated and degrading acts he performed on F. and E. In light of all these circumstances, the trial court could reasonably conclude that the probative value of evidence of the attack on Stacey outweighed any prejudicial impact.

In sum, the trial court properly admitted evidence of the attack on Stacey.

## II.

Next, Moreland contends the trial court erred in instructing the jury that in addition to considering the attack on Stacey as showing a propensity to commit sexual offenses within the meaning of Evidence Code section 1108, they could also use the evidence of the crimes against F. and E. for the same purpose. In particular, the trial court instructed that if by a preponderance of evidence the jury found that either the assault on Stacey occurred or one of the charged offenses occurred, the jury could consider those offenses in determining whether the other charged offense occurred. The trial court instructed the jury that with respect to its ultimate determination of guilt on the

11

charged offenses, evidence of the other crimes was not enough by itself to meet the prosecution's burden.

As we explain, although the trial court's reference to the preponderance of evidence needed for use of one charged crime as proof of the other charged crime had the potential for confusion, in light of the trial court's other instructions and the overwhelming evidence of Moreland's guilt, we find no likelihood that aspect of the instruction had any impact on the jury's verdict.

A. *Legal Analysis*

Shortly, after the briefs in this case were filed, the Supreme Court rendered its opinion in *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), in which it rejected the reasoning in *People v. Quintanilla* (2005) 132 Cal.App.4th 572 (*Quintanilla*), upon which Moreland relies, and held that Evidence Code section 1108 applies to charged as well as uncharged sex crimes. In particular, the Supreme Court held the trial court in that case properly instructed the jury that if it found that charged sex offenses occurred, it could use them in considering whether the defendant was disposed to commit the other charged offenses. (*Villatoro*, at pp. 1167-1168.) The court stated: "[W]e conclude nothing in the language of section 1108 restricts its application to uncharged offenses. Indeed, the clear purpose of section 1108 is to permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses. 'The propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony.'

12

[Citations.] . . . In light of this clear purpose, we perceive no reason why the Legislature would exclude charged sexual offenses from section 1108's purview, and no indication that it did so in either the text of section 1108 or its legislative history. Whether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence. Indeed, section 1108's legislative history explains that "'admission *and consideration* of evidence of other sexual offenses to show character or disposition would be no longer treated as intrinsically prejudicial or impermissible.'" [Citations.]" (*Villatoro*, at p. 1164, fn. omitted; see also *People v. Wilson* (2008) 166 Cal.App.4th 1034, 1052 (*Wilson*).)

In both *Villatoro* and *Wilson*, in which the court also held that Evidence Code section 1108 applies to charged as well as uncharged crimes, the trial courts did not instruct the juries that they could use evidence of a charged crime if they found by a preponderance of the evidence that the crime was committed. (*Villatoro*, *supra*, 54 Cal.4th at p. 1168; *Wilson*, *supra*, 166 Cal.App.4th at pp. 1052-1053.) Rather, in *Villatoro*, the jury was instructed that it needed to find proof beyond a reasonable doubt that a charged crime had occurred before it could use it as evidence of another charged crime. (*Villatoro*, at p. 1168.) In *Wilson*, the instruction made no reference to the preponderance of evidence standard. (*Wilson*, at pp. 1052-1053.) Thus, in both cases the trial court's instructions did not create any risk the juries would apply an impermissibly low standard of proof with respect to the defendants' guilt as to the charged offenses, a concern raised by the court in *Quintanilla*. (See *Villatoro*, at p. 1168; *Wilson*, at p. 1052-1053; *Quintanilla*, *supra*, 132 Cal.App.4th at p. 583.)

13

Here, the trial court *did* instruct the jury that a charged offense, if proven by a preponderance of the evidence, could be used as evidence of Moreland's disposition to commit the other charged crime. As suggested by the court in *Quintanilla*, arguably such an instruction does create some risk that a jury may apply an impermissibly low standard of proof on the question of the defendant's guilt. However, on this record we have no doubt the jury, given an instruction similar to the ones approved in *Villatoro* and *Wilson*, would have rejected Moreland's version of events.

First, we note the trial court emphasized to the jury that "[t]he bottom line . . . is the ever present, ever constant proof beyond a reasonable doubt." The trial court also reminded the jury that evidence of either the uncharged crime committed on Stacey or one of the charged crimes was not sufficient for the prosecution to "carry their burden of proof for the charges that are before you here in this case." The written instruction provided to the jury reminded jurors "[t]he People must still prove each charge and allegation beyond a reasonable doubt." We also note the trial court provided the jury with accurate general instructions on the burden of proof and the presumption of innocence.

Second, the record contains overwhelming proof of Moreland's guilt. Moreland did not dispute that he approached both women, took each of them on a 25-minute journey to his home, and performed sex acts with them at his home. The only dispute was whether they consented to those acts. On the issue of consent, there is not only the powerfully reinforcing aspect of each woman's almost identical account of what happened when they arrived at Moreland's home and the fact these incidents occurred

14

within a period of three months to two women who did not know each other.  There is also Stacey's account of Moreland's earlier attack on her.  In addition, however, there was ample evidence of the traumatic impact these incidents had on both F. and E.  The jury heard F.'s emotional 911 call and heard from E.'s friends, Lupita and Roxana, about the trauma they observed after Moreland attacked E.  That evidence of trauma made the victim's version of events far more credible than Moreland's.

Thus, although a less confusing instruction was certainly preferable, in the light of these circumstances, we have no reasonable doubt that given a simpler instruction the jury would have returned an identical guilty verdict.

### III.

Over Moreland's hearsay objection, the trial court permitted the prosecution to play a recording of the 911 call F. made after Moreland dropped her off at the border.  The trial court found that the statements F. made were spontaneous utterances within the hearsay exception provided by Evidence Code section 1240.

In the tape, F. can be heard sobbing while she related to the operator what had happened to her.  According to F., Moreland dropped F. off about a half hour before she was able to locate a telephone and place the call.  Although F. had a cell phone, it does not permit her to make calls on the United States side of the border.

On appeal, Moreland argues that the one-half hour, which elapsed between the time Moreland dropped F. off and the time she made the call, deprived F.'s statements of the spontaneity required by Evidence Code section 1240.  In particular, Moreland notes that in arguing for admission of the tape, the prosecutor conceded that F. may have

15

needed the 30 minutes after Moreland dropped her off to "collect her thoughts."  We find no error.

A.  *Legal Principles*

Evidence Code section 1240 provides an exception to the hearsay rule for the statement of a declarant which: "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  We review the admission of evidence under Evidence Code section 1240 for abuse of discretion. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

In discussing the role timing and circumstance play in determining whether a statement falls within the exception for spontaneous utterances, the court in *People v. Farmer* (1989) 47 Cal.3d 888, 903-904 stated:  "[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief.  [¶] The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is thus *not the nature of the statement but the mental state of the speaker*.  The nature of the utterance -- how long it was made after the startling incident and whether the speaker blurted it out, for example -- may be important, but solely as an indicator of the mental state of the declarant.  The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product

16

of deliberation, but it does not ipso facto deprive the statement of spontaneity.  Thus, an answer to a simple inquiry has been held to be spontaneous."  (Italics added.)

In a domestic violence case, *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, the victim arrived at a police station after arguing with her husband.  Approximately 30 minutes after the argument, she told officers questioning her that during the argument her husband had choked her, pushed her, hit her and threatened to kill her.  When she failed to appear at her husband's trial, an investigating officer testified as to what she told him.  Citing cases in which as much as one to two days had elapsed between a traumatic event and an excited utterance, the court rejected the husband's contention that the 30-minute period between the argument and his wife's statement deprived her statement of the required spontaneity:  "Much longer periods of time have been found not to preclude application of the spontaneous utterance hearsay exception.  [Citations.]"  (*Id.* at p. 1589.)  The court also rejected the husband's contention that the wife's presumed act of driving herself to the police station deprived her statement of its spontaneity.  (*Ibid.*)  The court found the wife's ability to escape danger in a car, and the fact that the disputed statements were made in response to routine questions from investigators, did not alter its conclusion about her mental state at the time she made the statements.  (*Id.* at pp. 1589-1590.)  "The crucial issue is the declarant's mental state and the evidence shows [the victim] was quite distraught; when [the investigating officer] initially encountered her at the police station, she was crying, shaking and fearful."  (*Id.* at p. 1590.)

B. *Analysis*

Here, the fact that 30 minutes elapsed between the time Moreland dropped F. off at the border and the time she was able to locate a telephone and call police in no sense deprived her statements to the 911 operator of the spontaneity required by Evidence Code section 1240. The sobbing which was heard on the 911 tape itself is evidence that F. was still under the stress of the profound trauma imposed on her by Moreland. However, the nature of the trauma F. endured, which included her abduction, threats to her life and multiple forcible and degrading sex acts, is even more powerful evidence that the time and effort F. took in locating a telephone and summoning the emotional wherewithal to report what had happened to her, was operating on her in a substantial way when she contacted the 911 operator. Given the nature of what F. suffered, the trial court could quite reasonably conclude that the stress of such profound events did not dissipate within a mere hour of their occurrence. Thus, the trial court did not abuse its discretion in admitting the recording of F.'s 911 call.

IV.

Finally, Moreland argues that the trial court abused its discretion in accepting the probation department's recommendation that it impose a $10,000 restitution fine. (§ 1202.4.) Moreland argues that because he will likely be spending the rest of his life in prison and has little if any prospect of paying the fine, the fine should be reduced to the statutory minimum of $200. We find no abuse of discretion.

While the ability to pay or difficulty paying a restitution fine is a factor a trial court should consider in imposing a restitution fine above the mandatory statutory

18

minimum, it is not a decisive factor.  (*People v. DeFrance* (2008) 167 Cal.App.4th 486, 504-505.)  The court must also consider "the seriousness and gravity of the offense and the circumstances of its commission."  (§ 1202.4, subd. (d).)  Where, as here, the crimes were serious and grave, involved two very vulnerable victims, and were committed in a violent, degrading and humiliating manner, the trial court did not abuse its discretion in imposing the maximum fine, notwithstanding the challenges Moreland will face in paying it.

## DISPOSITION

The judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


McINTYRE, J.


AARON, J.

19