Filed 9/13/13  P. v. Kelly CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046870 |
| v. | (Super. Ct. No. 04NF0689) |
| JEROME EUGENE KELLY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William L. Evans, Judge.  (Retired judge of Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed as modified.

Martha L. McGill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

Jerome Eugene Kelly appeals from a judgment after a jury convicted him of kidnapping to commit a sex offense, sodomy by force, forcible oral copulation, kidnapping, and sodomy by force, and found true movement of the victim and multiple victim enhancements. Kelly argues the trial court erred in admitting evidence, instructing the jury, and sentencing him. We agree Kelly's sentencing claim has merit. None of his other contentions have merit, and we affirm the judgment as modified.

FACTS

*Michelle H.*

One June evening in 2003 about dusk, Michelle, who was living in a homeless shelter because she was a victim of domestic violence, arrived at a bus stop after ingesting methamphetamine at a friend's house. She was "lightheaded, paranoid, . . . [and] nervous[,]" and wanted to go to the hospital but was afraid she would be arrested. Michelle sat at the bus stop sans shoes for about two hours when Kelly sat down and started talking to her. She told Kelly that she was not feeling well, and he offered to take her to the hospital and get her shoes. She felt so bad she accepted his offer and got into his car.

When Kelly drove past the hospital, Michelle asked him where he was going. Kelly replied he wanted to get her some shoes before he took her to the hospital. Kelly drove to a motel, said he was going to get some shoes, and got out of the car. She tried to get out of the car, but the doors were locked. After talking to a man, Kelly returned to the car without any shoes.

Kelly drove towards the hospital but did not stop and drove in circles. During the drive, Kelly asked Michelle what her drug of choice was. She denied using drugs. Kelly said he would take Michelle to his house to get her shoes and take her to the hospital. Kelly got onto the 91 freeway. Michelle asked him to take her to her sister's house and to be let out of the car.

2

Kelly grabbed Michelle's hand and tried to put it on his penis, but she pulled her hand away. He asked her if she was going to work for him as a prostitute. Kelly got off the freeway and drove to a park where he stopped the car. Kelly said Michelle could get out of the car, and he opened the passenger side door for her. When she got out of the car, he hit her on the head, and she fell to the ground. He picked her up and apologetically helped her back into the car, drove around, and returned to the park. Kelly told her that he was going to get her shoes and to follow him.

Kelly held Michelle's elbow as he led her through the park to his house. Michelle saw a man practicing martial arts with a stick. Kelly told Michelle to be quiet or he would kill her and the man. They walked for about 10 minutes to a dark and secluded ravine in the park. Kelly, who was wearing gloves, grabbed Michelle by the neck and told her to take off her pants. She started to comply with his demand but then refused. Kelly threatened to kill her, but she still refused. He threw her to the ground, pulled her pants down, and told her to spread her legs. Michelle refused and rolled into the fetal position. Kelly had anal intercourse with Michelle and ejaculated inside and outside her body. Kelly said he was going to kill her and started choking her. A dog started barking and someone turned on lights at a nearby home, which scared Kelly and he fled.

Michelle went to a few houses and knocked on the doors but no one answered. She went to the parking lot and saw a man in a white Jeep. Michelle told him a man had raped her, but the man said he did not want to get involved and drove away. She saw Kelly drive away. She eventually stopped two police officers and told them what had happened. She was hysterical and disheveled. They drove around and looked for Kelly but could not find him. The officers took Michelle to a rape center where she had a sexual assault examination and was interviewed.

3

Michelle said her assailant was an African-American male, about 20 to 25 years old, 170 pounds, and clean shaven. She said he wore a black shirt, tan shoes, and gloves. She emotionally and candidly described what had transpired. There were no injuries or evidence of anal intercourse.

*Elaina W.*

One evening seven weeks later, Elaina left her boyfriend's house. As she walked past a 7-Eleven, Kelly shouted at her from his car. Elaina kept walking, and Kelly drove beside her. He asked her name, age, and nationality. She told him her age and nationality but gave him a false name. Kelly told her to get into his car, but she refused. She saw three Hispanic men who appeared to be intoxicated but did not ask them for help because she thought they would assault her. Elaina walked faster, and Kelly told her to get into the car or he would shoot her. Kelly got out of the car and told Elaina to get in the car. She saw an item in his waistband and thought it was a gun. Kelly tapped his finger against the object, and it sounded hard.

Kelly pushed her into the car. Elaina cried and told Kelly to let her out. Kelly told her to "shut the fuck up." She told him that she was a diabetic, and he said he would take care of her. Kelly drove onto the 91 freeway. Elaina begged him to let her go and said she needed insulin and food. Kelly remained on the freeway for 10 minutes, exited the freeway, and stopped at a dark and secluded park.

Kelly and Elaina sat in the car for about 10 minutes listening to music. Elaina noticed a tattoo on Kelly's right arm that says, "respect."[1] Elaina did not try to flee because she thought Kelly had a gun. Kelly told her that she was pretty and he had never had sexual intercourse with a woman of her nationality before.

---

[1] A law enforcement officer confirmed Kelly has such a tattoo.

4

Kelly told Elaina to get out of the car and he led her to the top of a hill in the park. She repeatedly asked him to let her go, but he refused. Kelly put his arm around her and tried to kiss her, but she pushed him away. Kelly hit her on the mouth with his fist, and she fell to the ground face down. Kelly removed her pants and underwear and tried to have intercourse with her. He also touched her vagina with his finger. As Elaina was on her hands and knees, Kelly had anal intercourse with her for two to three minutes without a condom and without ejaculating. Kelly stopped, and told her to pull up her pants and immediately perform oral sex on him. Elaina complied because she did not want to die. She performed oral sex on him until he ejaculated in her mouth. Kelly told her to swallow his ejaculate, but she spit it out and vomited. Elaina offered to give Kelly $200 that she had at her parents' house if he let her go. Kelly walked to a nearby fence and smoked a cigarette. Elaina asked him to let her go. Kelly told her to stay where she was, and he left. After he left, Elaina awkwardly and painfully walked away.

Elaina had the same misfortune as Michelle when she asked a man in a truck to help her. A woman eventually stopped and drove Elaina to a gas station. Elaina went into a 7-Eleven and told the cashier what had happened, but the cashier did not believe her and would not let her use the telephone. A married couple finally helped Elaina contact the police, who took her to the hospital for a sexual assault examination.

Elaina told a forensic nurse what had happened to her. Elaina had injuries to her mouth and lips that were consistent with being punched and engaging in oral copulation. She had extensive lacerations in her vagina and anus.

*Identifications*

In December 2003, Elaina tearfully identified Kelly from a photographic lineup. In January 2004, Michelle also identified Kelly from a photographic lineup.

*Trial Court Proceedings*

In 2007, after an eight-count information involving three victims was whittled down to six counts, the trial judge, at a bench trial, found Kelly guilty on five of the six remaining counts. Kelly moved to relieve retained trial counsel, and the trial court appointed the public defender to represent Kelly. Kelly filed a motion for new trial on the grounds the prosecutor failed to disclose material evidence pursuant to *Brady v. Maryland* (1963) 373 U.S. 83, and he received ineffective assistance of counsel. In April 2008, after hearing witnesses' testimony and counsels' argument, the trial court granted the new trial motion based on the discovery violation. The public defender, alternate defender, and conflict counsel all declared conflicts.

In December 2008, an amended information charged Kelly with the following: Jane Doe No. 1-kidnapping to commit a sex offense (Pen. Code, § 209, subd. (b)(1))[2] (count 1), sodomy by force (§ 286, subd. (c)(2)) (count 2), forcible oral copulation (§ 288a, subd. (c)(2)) (count 3); and Jane Doe No. 2-kidnapping to commit a sex offense (§ 209, subd. (b)(1)) (count 4), and sodomy by force (§ 286, subd. (c)(2)) (count 5). As to counts 2, 3, and 5, the amended information alleged Kelly kidnapped the victim and the movement substantially increased the risk of harm to the victim (§ 667.61, subds. (a), (c) & (d)(2)), and he committed the offenses against more than one victim (§ 667.61, subds. (b), (c)(6) & (e)(5)). The amended information also alleged Kelly had one prior serious felony (§ 667, subd. (a)(1)), and one prior strike conviction (§§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)).

The trial court eventually granted Kelly's motion to represent himself. Ten months later, the trial court granted Kelly's request to revoke his in propria persona status and appointed counsel. A jury trial finally commenced in July 2011.

---

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

The prosecutor moved to admit the following uncharged sexual offense evidence pursuant to Evidence Code section 1108: (1) an April 1997 conviction for unlawful sexual intercourse with a minor (§ 261.5, subd. (c)); and (2) an October 2003 conviction for unlawful sexual intercourse with a minor (§ 261.5, subd. (c)). The prosecutor argued there is no requirement the uncharged sexual offenses be sufficiently similar to the charged offenses and the uncharged offenses were not too remote. Additionally, the prosecutor argued the factors articulated in *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), did not require the evidence's exclusion.

At an Evidence Code section 402 hearing, Kelly objected to admission of the uncharged sexual offense evidence. Defense counsel argued the uncharged sexual offense must be similar to the charged sexual offense, and in this case, the offenses were not similar. Counsel also argued admission of the uncharged sexual offense would be unduly prejudicial because the jury would be left to speculate the significance of the dissimilar conduct.

The trial court stated the uncharged sexual offense (statutory rape), and the charged sexual offenses (forcible rape), were "quite distinct" and inquired of the prosecutor the relevance of the uncharged sexual offense. Relying on Evidence Code section 1108's plain language, the prosecutor argued the statute contemplates the admissibility of evidence that demonstrates a propensity to commit unlawful sexual conduct and the Legislature included statutory rape, section 261.5, in that statutory scheme. The prosecutor asserted Evidence Code section 1108 does not include a similarity requirement. The prosecutor added the uncharged sexual offense was not unduly prejudicial because it did not involve force. The court and the prosecutor continued their discussion of the issue of whether similarity is required. The court took the matter under submission.

The next day, the trial court explained that it had conducted the appropriate weighing analysis and considered the differences between the uncharged sexual offenses and the charged sexual offenses. The court ruled the 2003 conviction was admissible pursuant to Evidence Code section 1108 because it demonstrates Kelly has a propensity "to commit illegal sexual acts." The court reasoned there is a difference in elements between the uncharged sexual offense, section 261.5, and the charged sexual offenses, particularly section 286, but "there is a demonstration on [Kelly's] part because of the similarity of those crimes for a propensity to commit illegal sexual acts." Relying on Evidence Code section 352, the court stated however the prosecutor would only be permitted to introduce the 2003 conviction and not the 1997 conviction. After a brief discussion concerning how the evidence would be presented to the jury, defense counsel suggested a stipulation, which the prosecutor agreed to.

At trial, Michelle testified that in November 2005 she pled guilty to lying under oath to receive financial and welfare aid in the amount of $15,121.

The parties stipulated Kelly's DNA was found on sperm and non-sperm fractions of Michelle's anal area. The parties stipulated Kelly's DNA was found on a sperm fraction of Elaina's internal rectal area. The parties also stipulated that in October 2003, Kelly was convicted of unlawful sexual intercourse with a minor that occurred in July 2003. The trial court stated: "Ladies and gentlemen, I once again want to give you a limiting instruction. This additional information you received with regard to an uncharged sex offense that has just been read by stipulation that . . . Kelly has a prior offense for unlawful sex with a minor, that's to be limited in your use. [¶] The law allows you to use it if you find it to be true to assist you in making decisions. You cannot find him guilty simply because he has a prior conviction of some other charge. It may provide you some evidence you can choose to ignore; you don't have to use it whatsoever. [¶] I'll give a specific limit[ing] instruction on it. You need to understand it's just a limited piece of information that you consider with all other information in the

8

case if you feel it provides any weight to you for any reason whatsoever. [¶] So please know it's not intended to demonstrate that . . . Kelly has a bad character or anything of that nature. Please accept it. It's just another piece you can use if you feel it's worth anything to you. So keep it in its limited place."

There was also evidence Kelly admitted he was convicted of a theft related offense involving dishonesty in 2000.

Kelly testified on his own behalf. Kelly admitted he sought the services of prostitutes on many occasions. With respect to Michelle, he thought she was a prostitute because she was sitting at a bus stop late at night and the buses were not running. He said Michelle initiated the contact by tapping on his window and getting into his car. Kelly asked her if she wanted to go on a date, and she said yes for $30, although specific acts were not discussed. Kelly noticed she did not have shoes and appeared to be high. Kelly drove to a motel where he knew someone to get her shoes but was unsuccessful; he did not lock her in the car. Kelly testified he drove to a park, which is where he commonly took prostitutes. When they got to the park, Michelle willingly walked to a secluded area of the park with him. He removed Michelle's pants and put on a condom. Kelly said she did not object when he put his penis in her anus, but the condom ripped and there was "pre cum" on his penis and in the condom; he did not ejaculate. Kelly claimed he stopped because he did not have another condom. Michelle demanded the money, Kelly refused, and Michelle got angry and left.

As to Elaina, Kelly said he was with his brother when he saw Elaina talking to three Hispanic men. Kelly said she was about to get into their car when he called to her. Kelly asked her what she was doing that evening, and after Elaina said she had gotten in a fight with her boyfriend, he asked her if she wanted to "kick it" with him. She agreed if he would take her home later. Kelly's brother moved to the back seat, and Elaina got into the front seat. Kelly went to 7-Eleven for cigarettes, took his brother home, and drove to the same park he took Michelle. On the way to the park, Kelly asked

9

and Elaina agreed to have sexual intercourse with him. Kelly claimed Elaina never objected or asked to leave. After they listened to music, Kelly unzipped his pants and Elaina performed oral sex on him and swallowed his ejaculate. They walked to a bench in the park and Kelly removed her clothes. Kelly had anal intercourse with Elaina because he did not want to get her pregnant. He claimed she did not object. Kelly removed his penis from her anus and asked her if she preferred anal intercourse or vaginal intercourse, and Elaina said "it doesn't matter." Kelly had anal intercourse with Elaina and ejaculated in her anus. Kelly testified that as they walked back to the car, Elaina talked about being together and having kids. Kelly thought she was "a little defective." Elaina asked Kelly to take her home but he offered to take her to a 7-Eleven and give her money for a taxi. When they arrived, Elaina, who was upset, got out, slammed the door, and walked into the store. Kelly testified he never forced Michelle or Elaina to engage in any sexual acts with him.

After closing argument, the trial court instructed the jury with CALCRIM No. 1191, "Evidence of Uncharged Sex Offense," and CALCRIM No. 1190, "Other Evidence not Required to Support Testimony in Sex Offense Case."

CALCRIM No. 1191 provided as follows: "The People presented evidence that [Kelly] committed the crime of . . . [section] 261.5 that was not charged in this case. This crime is defined for you in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that [Kelly] in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that [Kelly] committed the uncharged offense, you may, but are not required to, conclude from that evidence that [Kelly] was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that [Kelly]

10

was likely to commit [f]orcible [s]odomy [section] 286[, subdivision] (c)(2) and/or [f]orcible [o]ral [c]opulation [section] 288a[, subdivision] (c)(2) as charged here. If you conclude that [Kelly] committed the uncharged offense, that conclusion is only one fact to consider along with all the other evidence. It is not sufficient by itself to prove that [Kelly] is guilty of [f]orcible [s]odomy [section] 286[, subdivision] (c)(2) and/or [f]orcible [o]ral [c]opulation [section] 288a[, subdivision] (c)(2). The People must still prove each charge beyond a reasonable doubt."

CALCRIM No. 1190 stated as follows: "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." The court also instructed the jury with CALCRIM No. 301 as follows: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

A jury convicted Kelly of counts 1, 2, 3, and 5, and found true the allegations with respect to counts 2, 3, and 5. The jury acquitted Kelly of count 4 but convicted him of the lesser included offense of kidnapping (§ 207, subd. (a)).

The trial court sentenced Kelly to 100 years to life plus a determinate term of 20 years as follows: count 2-50 years to life and five years for the movement of victim enhancement; count 5-50 years to life and five years for the movement of victim enhancement; count 4-the middle term of five years; and the prior serious felony conviction-five years. The court imposed and stayed the sentence on count 1, and ran the sentence on count 3 concurrent to count 2.

DISCUSSION

I. *Evidence Code section 1108*

Kelly argues the trial court erred when it admitted evidence of his 2003 uncharged sexual offense conviction because it lacked probative value and was unduly prejudicial. Not so.

11

Evidence of an uncharged offense is generally inadmissible to prove criminal disposition. (Evid. Code, § 1101, subd. (a); *People v. Kipp* (1998) 18 Cal.4th 349, 369.) Evidence Code section 1101, subdivision (b), however, allows the trial court to admit "evidence that a person committed a crime . . . or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

As relevant here, Evidence Code section 1108, subdivision (a), states, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another *sexual offense* or offenses is not made inadmissible by [Evidence Code] [s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352." (Italics added.) Evidence Code section 1108, subdivision (d)(1), defines "'sexual offense'" as "a *crime* under the law of a state or of the United States that involved any of the following . . . ." (Italics added.) One of those *crimes* is unlawful sexual intercourse with a minor (§ 261.5, subd. (a)). (Evid. Code, § 1108, subd. (d)(1)(A).)

Evidence Code section 352, however, authorizes a trial court to exclude prior sexual offenses evidence offered pursuant to Evidence Code section 1108. Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"The two crucial components of [Evidence Code] section 352 are 'discretion,' because the trial court's resolution of such matters is entitled to deference, and 'undue prejudice,' because the ultimate object of the [Evidence Code] section 352

12

weighing process is a fair trial." (*Harris, supra,* 60 Cal.App.4th at p. 736.) We are mindful that "'"[t]he prejudice which [Evidence Code section 352] is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudicing' a person or cause on the basis of extraneous factors."' [Citation.] Painting a person faithfully is not, of itself, unfair." (*Harris, supra,* 60 Cal.App.4th at p. 737.) We review the trial court's admission of evidence pursuant to Evidence Code sections 1108 and 352 for an abuse of discretion. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

In *Harris, supra,* 60 Cal.App.4th at pages 737 to 741, the court articulated the following factors to determine whether evidence of prior sexual acts was properly admitted pursuant to Evidence Code section 1108: (1) the probative value of the evidence; (2) the inflammatory nature of the evidence; (3) the possibility of confusion of the issues; (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses; and (5) remoteness in time of the uncharged offenses.

*Probative Value*

Kelly argues evidence of his 2003 conviction for unlawful sexual intercourse with a minor had little if any probative value to the charged offenses because the 2003 conviction is not sufficiently similar to the charged offenses. We disagree.

*Harris, supra,* 60 Cal.App.4th at page 740, concerned Evidence Code section 1108 and whether evidence of an uncharged violent sexual attack was admissible in a case where defendant was charged with non-violent sexual offenses involving a breach of trust. The court stated, "Although this is not a[n] [Evidence Code] section 1101 case, the trial court properly took into consideration the degree of similarity of the prior and current offenses, as similarity would tend to bolster the probative force of the evidence." (*Harris, supra,* 60 Cal.App.4th at p. 740.) Disagreeing with the trial

13

court, the court of appeal concluded there was no meaningful similarity between the uncharged sexual offense and the charged offenses. (*Id.* at pp. 740-741.)

Here, the trial court did not abuse its discretion in admitting evidence of Kelly's 2003 conviction for unlawful sexual intercourse with a minor. The court properly weighed the probative value of the evidence against its prejudice and concluded its admission was not unduly prejudicial. Although the uncharged sexual offense was statutory rape and did not involve force, evidence Kelly engaged in unlawful sexual intercourse with a minor does have some relevance in assessing whether he committed a slightly different but equally unlawful sexual offense, forcible rape. Evidence Kelly preyed on a young woman and took advantage of her had probative value in determining whether Kelly preyed on adult women and took advantage of them. The uncharged 2003 conviction was no more inflammatory than the charged offenses because it did not include any force or violence. Contrary to Kelly's assertion otherwise, this does not mean the 2003 conviction bore no similarity to the charged offenses. The 2003 conviction was sufficiently similar but not more inflammatory. There is no likelihood the jury would confuse the issue because Kelly suffered a conviction from his 2003 conduct and the jury was not required to determine whether the conduct occurred. (*People v. Branch* (2001) 91 Cal.App.4th 274, 284.) Admission of the 2003 conviction did not consume an undue amount of time as it was admitted by stipulation. Finally, the 2003 conviction was not too remote because the conduct occurred the month between the time he assaulted Michelle and Elaina. Therefore, the trial court properly admitted evidence Kelly suffered a 2003 conviction for unlawful sexual intercourse with a minor pursuant to Evidence Code section 1108.

*Prejudice*

Because we have concluded the trial court properly admitted Kelly's 2003 conviction for unlawful sexual intercourse with a minor, we need not address his claim he was prejudiced by its admission. Nonetheless, he was not prejudiced because it was not

reasonably probable there would have been a different result had the court not admitted the 2003 conviction—the evidence of Kelly's guilt was overwhelming. (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.) Similarly, our conclusion also renders meritless his assertion admission of the evidence violated his federal constitutional rights. (*People v. Samuels* (2005) 36 Cal.4th 96, 114 [violations state evidentiary rules do not constitute federal constitutional error].)

II. *Jury Instructions*

A. *CALCRIM No. 1191*

Acknowledging he failed to object to the instruction and the case authority weighs against his claim but raising the issue to preserve it for federal review, Kelly contends the trial court erred in instructing the jury with CALCRIM No. 1191 because it violated his federal constitutional rights. We disagree.

In *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016 (*Reliford*), our Supreme Court upheld the constitutionality of a substantially identical instruction, the 1999 version of CALJIC No. 2.50.01, rejecting arguments similar to those raised by Kelly here. (*People v. Loy* (2011) 52 Cal.4th 46, 71-74) Additionally, other courts, citing *Reliford*, have rejected identical challenges to CALCRIM No. 1191. (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1103; *People v. Wilson* (2008) 166 Cal.App.4th 1034, 1049; *People v. Cromp* (2007) 153 Cal.App.4th 476, 480; *People v. Schanbel* (2007) 150 Cal.App.4th 83.) Likewise, we reject it here. Kelly's assertion those cases do not address the issue of whether the instruction is internally inconsistent is forfeited for failing to object on the specific grounds now asserted on appeal. (*People v. Geier* (2007) 41 Cal.4th 555, 590, overruled on another ground in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, .)

B. *CALCRIM No. 1190*

Again acknowledging he failed to object and the weight of case authority is against him but raising the issue to preserve it for future review, Kelly claims the trial

court erred when it instructed the jury with CALCRIM Nos. 1190 and 301 because they violated his federal constitutional rights. Again, we disagree.

The substantively similar predecessor CALJIC instructions to CALCRIM Nos. 1190 and 301 have been found to be legally correct. As stated in *People v. Gammage* (1992) 2 Cal.4th 693, 700 (*Gammage*): "It is not disputed that both CALJIC No. 2.27 [the predecessor of CALCRIM No. 301] and [CALJIC] No. 10.60 [the predecessor of CALCRIM No. 1190], considered separately, correctly state the law. 'In California conviction of a sex crime may be sustained upon the uncorroborated testimony of the prosecutrix.' [Citation.] We specifically upheld an instruction equivalent to CALJIC No. 10.60 as long ago as 1912. [Citation.]" After explaining the two instructions "overlap to some extent," the court opined each instruction "has a different focus." (*Gammage, supra,* 2 Cal.4th at p. 700.) The court stated: "CALJIC No. 2.27 focuses on how the jury should evaluate a fact (or at least a fact required to be established by the prosecution) proved solely by the testimony of a single witness. It is given with other instructions advising the jury how to engage in the *fact-finding* process. CALJIC No. 10.60, on the other hand, declares a substantive rule of law, that the testimony of the complaining witness need not be corroborated. It is given with other instructions on the legal elements of the charged crimes." (*Gammage, supra,* 2 Cal.4th 693 at pp. 700-701.) The court concluded a trial court may give both instructions in sexual offense cases. (*Id.* at p. 702.) Despite Kelly's claim "*Gammage* is flawed, for several reasons[,]" we are bound to follow it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

III. *Sentencing*

Kelly raises two sentencing contentions. Our resolution to the first renders the second moot.

16

*A. Section 654*

Kelly argues the trial court erred in failing to stay the sentence on count 4 because he committed count 4, kidnapping, in furtherance of and a means of committing count 5, sodomy by force. We agree.

Section 654 provides "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 proscribes multiple punishments for a course of conduct that violates more than one statute but constitutes an indivisible transaction. (*People v. Beamon* (1973) 8 Cal.3d 625, 637.) Whether a course of conduct is indivisible under section 654 depends on the intent and objective of the actor. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19 (*Neal*), overruled in part in *People v. Correa* (2012) 54 Cal.4th 331.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal, supra,* 55 Cal.2d at p. 19.) Therefore, to permit multiple punishments, the evidence must support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. (*Ibid.*) A "defendant's intent and objective are factual questions for the trial court" (*People v. Adams* (1982) 137 Cal.App.3d 346, 355), which may properly infer a defendant's intent from the circumstances surrounding his act.

The standard of review for defendant's appeal is substantial evidence. (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.) Under this standard, we review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the facts required to support its decision beyond a reasonable doubt. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128.) In this analysis, we must presume the existence of every fact the court could reasonably deduce from the evidence. (*People*

*v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  The trial court's determination cannot be reversed on appeal unless it is unsupported by evidence presented at trial.  (*People v. Ferguson* (1969) 1 Cal.App.3d 68, 75.)

In *People v. Latimer* (1993) 5 Cal.4th 1203 (*Latimer*), the California Supreme Court held multiple punishment for kidnapping and rape is barred by section 654, where the sole purpose of the kidnapping was to facilitate the rape. (*Latimer, supra,* 5 Cal.4th at p. 1216.)  The court explained where the kidnapping is part of a continuous course of conduct motivated by one objective, rape, the kidnapping—even if completed before the rape was committed—will be treated as incidental to and a means of committing the rape precluding punishment for both offenses.  (*Ibid*.)  Therefore, the court concluded where a defendant perpetrates both kidnapping for the purpose of committing rape and rape, imposition of separate sentences for both offenses is prohibited under section 654.  (*Latimer, supra,* 5 Cal.4th at p. 1216.).

Here, the evidence demonstrated that from the outset Kelly intended to have a sexual encounter with Michelle and thought she was a prostitute.  After they left the motel and Michelle begged Kelly to let her go and she spurned his advances, Kelly refused and kept driving.  To the extent this encounter could be characterized as one between a prostitute and her client ended at this point.  Kelly forcibly detained Michelle and drove her to the park knowing she wanted to be let go.  Like *Latimer*, based on the evidence Kelly intended to have a sexual encounter with Michelle and he kidnapped Michelle, the evidence established the kidnapping had no objective apart from facilitating the rape.  The fact the jury convicted Kelly of kidnapping, the lesser included offense of kidnapping to commit a sex offense, does not alter our conclusion.  Because we conclude the trial court should have stayed the sentence on count 4, we need not address Kelly's alternative claim the proper term on the consecutive sentence on count 4 is one-third of the middle term.

## DISPOSITION

We affirm the convictions but modify the judgment as follows: The five-year term imposed on count 4, kidnapping, is ordered stayed pursuant to section 654. The clerk of the superior court is directed to prepare an amended abstract of judgment consistent with this opinion and forward it to the Department of Corrections and Rehabilitation, Division of Adult Operations.


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


IKOLA, J.