Filed 3/26/15  P. v. Gontiz CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GERARDO GONTIZ,<br><br>        Defendant and Appellant. | A141234<br><br>(San Mateo County<br>Super. Ct. No. SC 074935A) |

A jury convicted defendant Gerardo Gontiz of numerous crimes perpetrated against 10 boys: 10 counts of lewd and lascivious acts with a child aged 14 or 15 (Pen. Code, § 288, subd. (c)(1), counts 1-2, 4, 9, 11, 14-16, 32-33); [1] eight counts of lewd and lascivious acts with a child under age 14 (§ 288, subd. (a), counts 18-20, 27-31); three counts of oral copulation with a minor under age 16 (§ 288a, subd. (b)(2), counts 5, 8, 10); one count of sodomy with a minor under age 16 (§ 286, subd. (b)(2), count 6); two counts of inducing a minor to pose for photographs involving sexual conduct (§ 311.4, subd. (c), counts 3, 7); and two counts of a lesser included offense of misdemeanor battery (§ 242, counts 17, 21). The court sentenced defendant to a cumulative prison commitment of 133 years to life.

Defendant contends the trial court erred in instructing the jury on propensity evidence and expert testimony; the evidence is insufficient to support some of the convictions; and the sentence imposed is cruel and unusual punishment. We shall reverse defendant's conviction on one count and affirm the judgment in all other respects.

_____

[1] All further section references are to this code except as noted.

1

## Evidence Presented at Trial

Defendant is married and has four children: three boys and a girl. He had frequent contact with boys as a volunteer at the high school, youth orchestra and church attended by two of his sons. Most of the sexual offenses were perpetrated against boys defendant met through these three institutions.

Dustin (counts 1-10)

Dustin was born in February 1995. He was a 14-year-old high school freshman at the start of the school year in 2009. Dustin was best friends with one of defendant's sons, who attended the same high school. Dustin was also "really good friends" with defendant's other son. Dustin, whose father was absent, testified he had a "father-son" type of relationship with defendant and "looked up" to defendant. Dustin called defendant "papa" and defendant called Dustin "mijo," which is Spanish for "my son." Defendant did "[m]any things" for Dustin. Dustin testified: "he would help me if I needed a ride somewhere. He would come make sure I was okay. He would buy me food when I was hungry. Let me and [defendant's son] hang out and do homework together, the whole nine yards."

In August 2009, defendant invited Dustin to sleep at his home one night. At home were defendant, his wife, his two sons who were friends with Dustin, his two younger children, and Dustin. That evening, Dustin and defendant's children were playing in the hallway, "just wrestling around, having a good time." When the wrestling ended, Dustin and defendant were alone in the hallway. While Dustin lay on the floor, defendant grabbed Dustin's penis over his clothes. Dustin pushed defendant's hand away. Later that night, Dustin was asleep on the couch and awoke when defendant grabbed the boy's penis under his pajamas and started stroking it. Dustin pushed defendant's hand away. Defendant returned his hand to Dustin's penis, stroked it and said "Just go with it." Dustin stopped resisting. Defendant continued stroking Dustin's penis "[a] lot."

Two weeks after the sleepover, defendant was "helping out" at the high school. Defendant came to Dustin during a class break and asked the boy to come to the bathroom with him to be photographed. Defendant asked to take photographs of Dustin's

"butt" and "dick" and the boy undressed and allowed defendant to take nude photographs with the camera on defendant's cell phone. Dustin testified he did not tell anyone what defendant was doing because he was "scared," "didn't know what to do" and did not want to get his best friend's father into trouble. Dustin said he did not want his friend "to go without having his father, because I don't have a father, and I know what it feels like."

In January 2010, defendant invited Dustin to join defendant's family for the weekend at a ranch in Modesto. Dustin went because he wanted to spend time with his friend, defendant's son. Defendant drove Dustin and his two sons to the ranch late at night. Defendant placed Dustin in the front passenger seat and his sons in the back seat. Defendant's sons fell asleep but Dustin stayed awake because he "didn't trust" defendant. During the car ride, defendant told Dustin that he wanted to "fuck [his] booty." Defendant put a jacket over his arm, unbuttoned Dustin's pants, and reached inside. Defendant stroked Dustin's penis until Dustin ejaculated.

Defendant's sons went to bed when they arrived at the ranch but Dustin could not sleep and went for a walk. Defendant joined Dustin on the walk. After walking for about 10 minutes, defendant lowered Dustin's pants, knelt in front of him, and orally copulated him. Defendant gave Dustin $50, which Dustin took because he "figured [his] family could use it." Dustin later gave the money to his mother, telling her he found it at a gas station.

At the ranch that night, Dustin shared a bed with defendant and one of his sons. Dustin slept in the middle, wearing pajamas. Dustin awoke with the tip of defendant's penis in his bare butt. It hurt. Dustin said "no" and defendant removed his penis. On the drive home, defendant again grabbed Dustin's penis.

In March 2010, defendant took Dustin to a fast-food restaurant. They went to the bathroom where defendant asked Dustin to remove his pants to be photographed. Using his cell phone, defendant took photographs of Dustin's penis and buttocks. Sometime between March 2010 and the end of the school year, defendant hosted a going-away party for a school teacher at defendant's house. Defendant took Dustin into the garage and

3

orally copulated him. Defendant then asked Dustin to orally copulate defendant, and Dustin complied.

Sometime after the party, Dustin again accompanied defendant's family on a weekend trip to the Modesto ranch. Defendant drove his car with Dustin in the front passenger seat and one of defendant's sons in the backseat, asleep. Defendant stroked Dustin's bare penis and said he wanted to "fuck [Dustin's] booty" and "stuff like that." At the ranch, defendant touched Dustin's penis and orally copulated him. Dustin also orally copulated defendant.

Throughout the school year, defendant had given Dustin money and other things, including an "air soft gun" Dustin always wanted. Dustin interpreted these gifts as "almost like a reward" for remaining quiet about the molestation. Dustin testified he frequently thought about telling his mother about the molestation, but he was "[s]cared," "messed up in the head," and did not want people to think he was gay. As the school year came to a close in June 2010, Dustin became "very violent" and suicidal. He had trouble sleeping and had nightmares in which defendant "would come and harm [him]" sexually. Finally, during the summer of 2010, Dustin disclosed the incidents of molestation to two of his friends. When one friend told him that he needed to tell someone or the friend "was going to call the cops," Dustin decided to tell his mother.

On August 26, 2010, Dustin told his mother and step-father about the molestation and she immediately called the police. The next day, Dustin spoke to a detective with the Redwood City Police Department. Dustin agreed to participate in a "pretext phone call" to defendant. During the phone call, Dustin asked defendant "what made you think I wanted to have sex with you Papa?" and defendant replied: "It was just me and my stupidity. It was just me only. . . . [There is] [n]othing wrong with you." Dustin asked, "Then what is wrong with you?" Defendant replied: "I'm wrong. I'm wrong." Dustin told defendant that his parents "will call the police if they find out" and defendant said, "[p]lease don't," "[t]hat will destroy my family totally." Defendant began sobbing, saying "it was wrong" and "I'm so sorry." Shortly after the pretext phone call, officers arrested defendant at his home. The police seized a laptop from defendant's vehicle. The laptop

4

contained hundreds of sexually explicit images of young males that had been downloaded from the Internet.

Cristian (count 11)

Cristian was born in October 1994. He attended the same high school as defendant's son, where Cristian was a freshman during the 2009-2010 school year. Cristian testified he was friends with defendant's son but not "very good friends." Defendant gave money to Cristian, $10 or $20 at a time, and also gave him two or three cell phones. During the school term, defendant invited Cristian to his house after school and, later that day, asked the boy to sleep over. Cristian played with defendant's son and slept on the floor of the bedroom occupied by defendant's sons. Cristian did not have pajamas with him so he slept in his clothes.

In the morning, Cristian awoke to defendant standing in the bedroom doorway wearing pajamas and holding a cell phone. Cristian lay on the floor, on his back, covered with a blanket. Defendant's sons were still asleep. Defendant approached Cristian and sat on his ankles, straddling him, with defendant's rear end on the boy's ankles and a leg to each side. As defendant straddled Cristian, he talked about his cell phone, said "what a great phone it was" and showed the boy some of its features. Cristian was "confused" and thought defendant's behavior "weird." Defendant straddled Cristian's ankles for "three or four minutes," then lay down next to Cristian. Cristian rolled onto his side so that his back was to defendant. Defendant "spooned" Cristian, placing his chest to Cristian's back and reached his arm over Cristian and "grabbed" the boy's chest, touching Cristian's left pectoral area. Defendant also reached his arm over Cristian's side to put his cell phone in front of the boy's face, continuing to show its features. Defendant "spooned" Cristian for eight to 10 minutes. Defendant's behavior made Cristian "feel very uncomfortable." Cristian testified he was not interested in the cell phone and was ready to hit defendant if he touched "any private part." Defendant finished showing Cristian his phone and left the room. Cristian telephoned his mother and asked her to pick him up, which she did.

Donovan (counts 14 & 15)[2]

Donovan was born in March 1995. During his freshman year at high school (2009-2010), Donovan was "pretty close" friends with defendant's son. Donovan testified that defendant was a "constant presence" on campus that year, accompanying students on school trips and taking "lots of pictures." One day, defendant arrived at school to pick up his son and approached a group of boys in the parking lot. Defendant hugged the boys then slapped each of their butts. When slapping Donovan's butt, defendant whispered in the boy's ear "You have a big butt."

On another occasion during the school term, defendant drove Donovan to defendant's house to "hang out" with defendant's son. They stopped at a juice store on the way. Donovan mentioned to defendant that he wanted to get parts for one of his skateboards and defendant gave him $20. As they were driving to defendant's house, defendant grabbed Donovan's leg just above the knee, squeezed it a few times, and said, "You have strong legs from skateboarding."

In August 2010, Donovan attended a funeral, after which the boy accompanied defendant and his family to defendant's church. Once there, defendant offered to show Donovan sound equipment in a back room. Donovan and defendant were seated alone in the room when defendant grabbed Donovan's left leg above the knee and, over the course of 20 seconds, moved his hand "all the way up" Donovan's thigh to the area of his pant pocket. Defendant did not touch Donovan's genitals. Donovan "stood up before anything else happened."

Alejandro R. (counts 16 & 17)

Alejandro R. was born in August 1995. He became friends with defendant's son during his freshman year in high school, 2009 to 2010. Defendant asked Alejandro and other students to call him "papa" and defendant called Alejandro "mijo," or "my son." Near the end of the school year, Alejandro went to defendant's house to work on a biology project with defendant's son. Defendant drove Alejandro to the house. On the

---

[2] Counts 12 and 13 were dismissed before trial.

6

way, he "grabbed" Alejandro's leg just above the knee and held it for about five seconds. At the house, defendant was showing Alejandro a fish tank in his son's bedroom when he brushed his hand across the boy's butt and squeezed it. Alejandro felt "[v]ery uncomfortable," looked at defendant and said "No." Defendant "laughed it off," and Alejandro left the room. Later that same day, defendant "patted" Alejandro's butt while Alejandro was standing in the living room.

Jose (counts 18 & 19)

Jose was born in December 1995. He was friends with defendant's sons through the church they attended. Jose knew defendant since the boy was four years old. Defendant was always friendly with him, and would hug and kiss him on the cheek. Jose testified the "friendly touching" changed to a "different touching" when Jose was nine years old. When Jose was nine years old, he took a shower at defendant's house. He slipped and fell exiting the shower and landed on his butt. Jose cried out for help and defendant came into the bathroom. Defendant massaged Jose's bare butt then moved his hand to the "front area" and massaged the boy's penis. Jose told defendant he felt better and defendant "let go."

Defendant continued to touch Jose over the years, both at defendant's home and the church's audio-visual room. At church, defendant would slap Jose's butt, hug him and cup his testicles over his clothes. At home, defendant would touch Jose's butt and bare penis. Jose testified that, between the ages of 9 and 13, defendant touched his genitals about 90 times. Defendant frequently gave Jose money.

When Jose was 13 years old, defendant invited Jose to accompany his family on a trip to his ranch in Modesto. When they arrived at the ranch, defendant invited Jose to go outside and look "around the ranch," even though it was around 1:00 a.m. and "very dark." He did not invite anyone else to come. Defendant and Jose walked to where the horses were kept, about 100 feet away from the house. Defendant grabbed Jose's shoulders then went down on his knees, used one hand to hold Jose's leg and the other hand to reach inside the boy's pants and grab Jose's bare penis. Jose said he was tired and defendant stopped.

7

Julio (counts 20 & 21)

Julio was born in January 1995 and is Jose's brother. Julio was about five years old when he met defendant at church. Julio testified he was eight or nine years old when defendant started hugging him and kissing him on the cheek. The touching became "different" when Julio was around 11 or 12 years old. The hugs at church became longer, which made Julio "uncomfortable." At this age, Julio occasionally visited defendant's home to play with defendant's sons. On one visit when Julio was about 12 years old, the boy was watching television when defendant started touching him on the leg.[3] Defendant moved his hand toward Julio's "private part" and rubbed Julio's penis over his clothing. That night, Julio slept on the floor in the bedroom of defendants' sons. Defendant came into the room, kissed Julio on the cheek, and lay next to him on the floor. Defendant put his hand under Julio's sleeping bag and rubbed Julio's penis over the boy's clothes. Julio wanted to wake defendant's sons but he was afraid. He told defendant he was tired and defendant left.

Julio continued to see defendant at church. Defendant regularly took the boy to the church audio-visual room where defendant would hug Julio, kiss him on the cheek and "sometimes touch [his] butt." Julio was around 12 years old but could have been as old as 15. Julio sat in the front passenger seat. As defendant drove, he rubbed Julio's leg and penis. Defendant praised Julio's musical skills and told him not to "give up." Afterward, he said, "I'm, you know, very sorry for what I'm doing." He added, "Please don't tell anybody."

Daniel (count 27)[4]

Daniel was born in January 1998. In Spring 2010, 12-year-old Daniel and a friend were talking in the church's audio-visual room. Defendant entered the room and asked

---

[3] When interviewed by the police, Julio said the sleep over occurred when he was 12 years old. Julio was less certain when testifying at trial, saying he could have been 12, or as old as 15.

[4] There was no conviction on counts 22 through 26. The jury deadlocked on counts 22 and 26, leading the prosecutor to dismiss them. Counts 23 through 25 were dismissed pretrial.

Daniel's friend to get defendant water. The friend complied, leaving Daniel alone with defendant. Defendant told Daniel he "cared about" him and loved him. As he spoke, defendant shook Daniel's hand and passed the boy $10 he had cupped in the palm of his hand. Defendant hugged Daniel and kissed the boy on the cheek. Defendant then put his hand inside the waistband of Daniel's pants, reached inside the boy's boxers and touched Daniel's bare penis for several seconds. Daniel pushed defendant away.

Michael (counts 28 & 29)

Michael was born in May 1997. Michael's sister is married to defendant. Michael lived with defendant and his family for about a month in the summer of 2010, when the boy was age 13. During that period, defendant put his hand in Michael's pants and grabbed his bare penis on at least two occasions. Michael testified that, on each occasion, defendant put his hand down the waistband of the boy's pants and "grabb[ed]" Michael's penis and held it, preventing the boy from moving away.

Alejandro H. (counts 30 & 31)

Alejandro H. was born in June 1998. Alejandro was 12 years old when he attended the church where he met defendant. Alejandro saw defendant touching male children in the audio-visual room. Alejandro testified that people at the church commonly hugged when greeting each other but "when [defendant] would hug [the boys], his hands would go on their lower back; their butt." Defendant gave the boys money and chewing gum.

When Alejandro was 12 or 13 years old, he was alone with defendant in the audio-visual room. Defendant hugged Alejandro, "grabbed" his butt and said he "smelled good." Alejandro backed away and left. Another time, the church pastor told Alejandro to go to the audio-visual room to say hello to defendant. Alejandro did not want to go because he knew what defendant "was like" but the boy complied. In the audio-visual room, Alejandro was alone with defendant. Defendant hugged Alejandro, grabbed his testicles over his clothes, and asked him if he "was growing hair yet." Alejandro pushed defendant away. Defendant said he was "just joking around," to which Alejandro responded that he did not "joke around like that."

9

Arturo (counts 32 & 33)

Arturo was born in October 1994. In 2008, he was a member of a youth orchestra in San Mateo County. Defendant's son was also a member of the orchestra. Defendant volunteered with the orchestra; he came to "every single" Monday rehearsal and photographed the orchestra members as they practiced. He also gave Arturo and some of the other members money for snacks.

Arturo was 14 years old in November 2008, when defendant asked Arturo's mother if Arturo could spend time after a Saturday dress rehearsal with defendant's son. Defendant had asked many times before, and this was the first time Arturo was not busy. Arturo's mother agreed.

Defendant drove his son and Arturo to a large department store to pick up food to bring home for lunch. Arturo sat in the front passenger seat of defendant's car. On the way, defendant commented on Arturo's facial hair, remarking that "usually people [his] age don't have facial hair." Defendant also "talked about how strong [Arturo] was." As defendant drove, he "casually" placed his hand on Arturo's left thigh. He rubbed Arturo's thigh "up and down maybe an inch," reaching as far as Arturo's "upper thigh." Occasionally, he squeezed Arturo's thigh.

At the store, defendant offered to buy Arturo an iPod worth "around $145 to $169." Arturo declined. Defendant rubbed Arturo's back between the shoulder blades, making "skin-to-skin contact." On the drive from the store to defendant's house, defendant continued touching, squeezing, and rubbing Arturo's left leg.

At defendant's house, defendant's son and Arturo ate lunch and then played video games in the living room. Arturo sat on the right side of the couch near the armrest and defendant's son sat to his left. Defendant joined them on the couch and, instead of sitting on the couch cushion near his son, sat next to Arturo "in an awkward position," partly on the armrest and partly on the seat of the couch. When Arturo did well in the game, defendant congratulated him and rubbed his back, sometimes over clothes and sometimes "skin to skin." Defendant then started to squeeze Arturo's penis over the boy's pants. Defendant "grabbed almost the whole penis" and continued to squeeze until Arturo

10

ejaculated. Arturo was confused and embarrassed; he testified it was the first time he ever ejaculated. Arturo went to the bathroom to clean his pants.

When Arturo returned to the living room, defendant invited him into the garage where he gave Arturo $200 for an iPod Touch. Defendant told Arturo he was a "good person" and he "wanted to remain in contact." Arturo purchased the iPod, which he used to exchange emails with defendant. One day during orchestra rehearsal, defendant asked to see Arturo's iPod. Defendant took it and, when he returned it, showed Arturo photographs of penises on the device and pointed out one that had ejaculated. Defendant invited Arturo to his house "multiple times" but Arturo refused and "tried to avoid him" at orchestra rehearsals.

Expert testimony

Miriam Wolf, a licensed clinical social worker and forensic interview specialist, testified for the prosecution as an expert in child sexual abuse and child sexual abuse accommodation syndrome (CSAAS). Wolf testified that CSAAS is a term used to describe a pattern of behavior exhibited by children who may have been sexually abused. CSAAS describes observed behavior in children believed to be sexually abused and is not a diagnostic tool to assess whether an individual has, in fact, been abused. CSAAS describes behavior; it is not a checklist that can be used to diagnose molestation or to detect child sexual abuse.

CSAAS has five components: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted or unconvincing disclosure; and (5) retraction. The first component, secrecy, describes an abused child's tendency to keep the secret of sexual abuse for "extended periods of time." Helplessness, the second component, refers to the child's inability to understand "what to do or how to behave" when sexually abused. Entrapment and accommodation describes the child's feeling that he or she is "stuck" in the situation without outside help and must "figure out some way to cope with or live with" the abuse. When a sexually abused child reveals the abuse, the disclosure may be delayed, conflicted or unconvincing (fourth component) because children do not relate an event in a "tight, neat package" with a "clear beginning, middle and end with

11

everything that happened disclosed all at one time." The final component of CSAAS, retraction, is based on the observation that a substantial portion of children who allege sexual abuse recant. When a child alleges sexual abuse, "[m]any times people are upset with them; many times people don't believe them; many times the person who was important to them, they can't see anymore or the person gets arrested. Things happen and start spinning; and for a child, it makes sense to say if I just take it back and I say that it didn't happen, then this mess will go away."

A forensic psychologist, William O'Donohue, testified for the defense concerning child sexual abuse. O'Donohue questioned the methodology and conclusions of CSAAS. He opined that the five behavioral patterns identified in CSAAS were as consistent with false allegations of child abuse as with true allegations. O'Donohue testified that "false memories" may be created in children through "repeated questioning, suggestive questions, [and] social conformity" pressures.

**Discussion**

Defendant contends the trial court erred in instructing the jury on criminal propensity evidence and expert testimony concerning CSAAS; the evidence is insufficient to support four counts of lewd and lascivious acts; and the sentence imposed is cruel and unusual. We address these claims in turn.

1. The jury instruction on criminal propensity was proper.

Defendant contends the trial court erred in instructing the jury on criminal propensity. Evidence of a defendant's criminal propensity is usually inadmissible. (Evid. Code, § 1101, subd. (a).) An exception to this rule exists for cases involving sexual offenses. (Evid. Code, § 1108.) "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses" is admissible to prove propensity unless the prejudicial effect of the evidence outweighs its probative value. (Evid. Code, § 1108, subd. (a); see Evid. Code, § 352.) Our Supreme Court has upheld the constitutionality of Evidence Code section 1108. Our high court has also upheld a jury instruction permitting a jury "to infer the defendant has a disposition to commit sex crimes from evidence the defendant has committed other sex

12

offenses" and to "infer from this predisposition that the defendant was likely to commit and did commit the charged offense." (*People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1013.) The standard jury instruction currently in use, CALCRIM No. 1191, is substantially the same as the instruction approved in *Reliford* and has itself been judicially approved. (*People v. Cromp* (2007) 153 Cal.App.4th 476, 480.)

At issue here is a modified version of CALCRIM No. 1191, which defendant contends misstates the law. The standard instruction permits jurors to use prior uncharged sex crimes to infer a defendant's propensity to commit the sex crime charged at trial. (CALCRIM No. 1191.) The modified instruction permitted jurors to use currently charged sex crimes to infer defendant's propensity to commit another sex crime charged in the same case and, more specifically, to infer defendant's propensity to have the same specific intent in the charged crimes.[5] The prosecutor relied upon this instruction in closing argument to the jury: "[I]f you believe that the defendant committed the [charged lewd and lascivious acts] against Dustin beyond a reasonable doubt, you can use the sexual intent in those cases to infer that when he touched Donovan's thigh, he also had something sexual in mind."

The instruction was proper. A charged sex crime may be used to prove a defendant's propensity to commit another sex crime charged in the same case. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1156.) "[N]othing in the language of [Evidence Code] section 1108 restricts its application to uncharged offenses." (*Id.* at p. 1164.) In *Villatoro*,

---

[5] The modified instruction stated: "If you decide beyond a reasonable doubt that the defendant committed a specific intent crime, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to have the requisite specific intent for other charged specific intent crimes, and based on that decision also conclude that the defendant was likely to and did have the requisite specific intent for other charge[d] offenses. [¶] If you conclude that the defendant committed a charged specific intent offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the other charged offenses. The People must still prove each element of every charge beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the specific intent of the defendant in certain charged offenses."

the jury was given a modified version of CALCRIM No. 1191 instructing the jury, in relevant part: "If you decide that the defendant committed one of these charged offenses [of rape and sodomy], you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit the other charged crimes of rape and sodomy, and based on that decision also conclude that the defendant was likely to and did commit the other offenses of rape and sodomy charged." (*Id.* at p. 1167.)

The only material difference between the *Villatoro* instruction and the instruction given here is the latter's focus on intent rather than disposition more generally. In this regard, the instruction is modeled on a jury instruction approved in *People v. Wilson* (2008) 166 Cal.App.4th 1034, 1044-1045. In *Wilson*, the jury was instructed, in relevant part: "If you decide that the defendant committed a charged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to have the requisite specific intent for other charged crimes, and based on that decision also conclude that the defendant was likely to and did have the specific intent for the other charged offenses." (*Ibid.*) The instruction was approved as a correct statement of the law. (*Id.* at pp. 1052-1053.)

Defendant maintains that *Wilson* was wrongly decided. He argues that a defendant's commission of sex crimes may be used to infer the defendant's propensity to commit sex crimes but may not be used to infer defendant's propensity to have specific intent to commit sex crimes. The argument fails to acknowledge that the commission of a crime is the conjunction of act and intent. If one has a propensity to commit a sex crime like a lewd and lascivious act with a minor, one necessarily has a propensity to commit such an act with a lewd intent. The instruction given in *Wilson*, as here, was simply "narrower" than the standard instruction in focusing on a propensity to have a certain intent rather than a propensity to both act and have a certain intent. (*People v. Wilson,*

*supra,* 166 Cal.App.4th at p. 1052.) The modified instruction was not erroneous and the instruction's minor departure from the standard version harmless.[6]

2. <u>The jury instruction on expert testimony concerning CSAAS was proper.</u>

Defendant contends the court erred in giving a standard jury instruction on expert testimony concerning CSAAS. (CALCRIM No. 1193.) It has long been held that expert testimony regarding CSAAS is admissible for limited purposes in child sexual abuse trials. "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.)

A standard jury instruction explains the limited use of CSAAS testimony. (CALCRIM No. 1193.) Pursuant to that instruction, the jury was advised: "You have heard testimony from Ms. Miriam Wolf and Dr. William O'Donohue regarding child sexual abuse accommodation syndrome. [¶] Their testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not the alleged victim's conduct was not inconsistent with the conduct of someone who has been molested, *and in evaluating the believability of his testimony*." (Italics added.)

Defendant argues that the last phrase, italicized above, undermined the limitations expressed in the rest of the instruction and invited the jury to regard evidence that the alleged victims manifested some or all of the symptoms of CSAAS as proof their molestation claims were true. We disagree. CALCRIM No. 1193 clearly and

---

[6] We do not suggest that CALCRIM No. 1191 should be modified to focus on intent or otherwise modified. We hold only that the trial court did not err in giving the modified instruction in this case.

15

appropriately informed jurors of the relevant legal principles. Contrary to defendant's argument, the instruction does not state, explicitly or implicitly, that the evidence could corroborate the victims' claims of abuse. To the contrary, it expressly stated that the testimony "is not evidence that the defendant committed any of the crimes charged against him." (CALCRIM No. 1193.) The instruction is not objectionable because it allows jurors to consider CSAAS testimony "in evaluating the believability" of testimony; that is precisely the issue the evidence is offered to prove. Expert testimony regarding CSAAS "is admissible to rehabilitate the complaining witness when the defendant impeaches [his or] her credibility" (*People v. McAlpin, supra,* 53 Cal.3d at p. 1300) or the evidence itself raises credibility concerns (*People v. Patino* (1994) 26 Cal.App.4th 1737). Witness credibility was at issue because the boys did not immediately report the molestation and the defense noted this fact in closing argument to the jury stating, as to Alejandro R.'s claim, that it came "out of the blue." CALCRIM No. 1193 is a correct statement of law and was properly given in this case.

3. <u>The evidence is insufficient to convict defendant for the lewd or lascivious act alleged in count four.</u>

The jury found defendant guilty of masturbating Dustin at the Modesto ranch in January 2010 (count four). (§ 288, subd. (c)(1).) Defendant contends there is no testimony to support the conviction. He is correct, necessitating reversal on that count.

Dustin testified that defendant masturbated him on the drive to the ranch; he did not testify about any masturbation at the ranch. For jurisdictional reasons—because it was not known in what county the conduct occurred when in transit to the ranch—the prosecution specified that count four related exclusively to conduct occurring at the ranch and not in transit. The prosecutor told the jury that "only" incidents at the ranch were relevant to the masturbation (count four) and oral copulation (count five) charges. In arguing for conviction on those counts, the prosecutor pointed to Dustin's testimony about a walk with defendant at the ranch. The prosecutor told the jury: "The defendant touches his penis and then puts his mouth on [Dustin's] penis and orally copulates him." But Dustin did not testify that defendant touched his penis, much less masturbated him,

16

during this incident. Dustin testified that he did not remember how the encounter began, only that defendant copulated him.

The Attorney General concedes on appeal that Dustin did not "directly testif[y] about an incident of 'penis touching' during his first stay at the Modesto ranch" but asserts that Dustin's responses to questions about the second trip "implied that such an incident did indeed occur." When Dustin was testifying about his second stay at the ranch, the prosecutor asked if defendant touched Dustin's penis "on this trip as well" and Dustin said "yes." The Attorney General argues that this testimony constitutes substantial evidence that defendant touched Dustin's penis at the Modesto ranch during the first visit, thus supporting conviction on count four. We disagree. The testimony is vague and ambiguous and permits, at most, an inference that defendant touched Dustin's penis on the first "trip." But the term "trip" was used to include both time in transit and at the ranch, so that the testimony does not necessarily show that the touching occurred at the ranch. The conviction on count four must be reversed.

4. Substantial evidence supports the convictions for the lewd or lascivious acts alleged in counts 11, 14 and 32.

Defendant contends there is insufficient evidence to support conviction on three counts that involved touching boys on their ankles (count 11) or thighs (counts 14 and 32). (§ 288, subd. (c)(1).) Defendant maintains that "[t]ouching an ankle or leg, with no further explicit sexual touching, is too equivocal to support a finding the touching was accompanied by an intent to arouse the perpetrator's or victim's sexual desires."

It is well-established, however, that a " 'lewd and lascivious' act need not be inherently sexual in nature nor need it be shown that the offender touched the child's private parts." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1380, italics omitted.) "The crime is committed by any touching of a child with the requisite intent." (*Ibid.*) The requisite intent is "the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of a perpetrator or victim. (§ 288, subd. (a).) Section 288 is violated by "a touching, even one *innocuous or inoffensive* on its face, done with lewd intent." (*People v. Lopez* (1998) 19 Cal.4th 282, 290.)

17

" '[T]he trier of fact looks to all the circumstances, including the charged act, to determine whether it was performed with the required specific intent.' [Citations.] Other relevant factors can include the defendant's extrajudicial statements [citation], other acts of lewd conduct admitted or charged in the case [citations], the relationship of the parties [citation], and any coercion, bribery, or deceit used to obtain the victim's cooperation or avoid detection." (*People v. Martinez* (1995) 11 Cal.4th 434, 445.) "Criminal intent will rarely be shown by direct evidence and must frequently be inferred from a defendant's conduct." (*People v. Gilbert, supra,* 5 Cal.App.4th at p. 1380.)

There was ample evidence of defendant's lewd intent. On count 11, the prosecutor charged defendant with touching Cristian with a lewd intent, "to wit: straddled legs." Cristian testified that, during a sleep-over, defendant entered the bedroom where his sons and Cristian slept. With his sons still asleep, defendant, wearing pajamas, sat on Cristian's ankles as the boy lay on the floor. Defendant straddled Cristian, with defendant's rear end on the boy's ankles and a leg to each side. Defendant straddled Cristian for "three or four minutes" as he talked about his cell phone and showed the boy some of its features. Defendant then lay next to Cristian. Defendant "spooned" Cristian, placing his chest to Cristian's back and reached his arm over Cristian and touched the boy's chest as he continued to show the boy features of his cell phone. Defendant "spooned" Cristian for eight to 10 minutes.

The jury could reasonably infer that defendant straddled Cristian to gratify defendant's passions or sexual desires. Cristian testified he was not "very good friends" with defendant's son yet defendant gave money and cell phones to Cristian, arranged a "play date," and invited Cristian to stay the night. With his sons asleep, defendant sat on Cristian's legs for several minutes then lay next to the boy, spooning him. The straddling was without any apparent innocent purpose, as an adult does not commonly sit on a child's legs to discuss cell phone features. Also, the intimate position defendant took in laying next to Cristian evinces a sexual intent that the jury could reasonably conclude was present when appellant straddled Cristian just moments before. As discussed previously, the jury was also free to conclude that defendant committed lewd acts against other boys,

18

as charged in the case, and conclude from that evidence that defendant was disposed to, and did, commit a lewd act against Cristian.

Substantial evidence also supports the other convictions. Count 14 concerned defendant's touching of Donovan's thigh. Donovan testified that, while a passenger in defendant's car, defendant grabbed Donovan's leg just above the knee, squeezed it a few times, and said, "You have strong legs from skateboarding." Count 32 related to defendant rubbing Arturo's thigh. When Arturo was a passenger in defendant's car, defendant commented on Arturo's facial hair, remarking that "usually people [his] age don't have facial hair" and "talked about how strong [Arturo] was." As defendant drove, he placed his hand on Arturo's leg and squeezed and rubbed Arturo's thigh "up and down" reaching as far as Arturo's "upper thigh."

The jury could infer sexual intent in these acts. The act of rubbing or squeezing another's thigh is suggestive of sexual intent, especially when coupled with compliments about physical appearance. The context of the acts is also significant. In Donovan's case, defendant gave the boy gifts, once slapped his rear end while whispering in his ear "you have a big butt," and, on a later occasion, grabbed Donovan's leg above the knee and moved his hand "all the way up" Donovan's thigh to the area of his pant pocket. As for Arturo, defendant masturbated Arturo within hours of rubbing his thigh, strongly suggesting that defendant had a sexual intent on the earlier occasion.

Defendant claims his conduct in these three counts is equally consistent with what the prosecution expert called a "grooming" process, in which a child molester desensitizes children to prepare them for later sexual touching but acts without a present intent to gratify sexual desires. The contention does nothing to undermine the jury's verdict. "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not

19

warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.) The evidence fully supports the jury's finding that defendant acted with a present sexual intent.

5. The sentence imposed is constitutional.

The court sentenced defendant to a cumulative prison sentence of 133 years to life: eight consecutive terms of 15 years to life (counts 18-20, 27-31), for an indeterminate term of 120 years to life, plus determinate terms totaling 13 years (three years on count 1 and eight months each on counts 2-11, 14-16, 32-33).

Defendant maintains that his sentence violates the constitutional prohibition against cruel and unusual punishment. (U.S. Const., 8th Amend.) The Eighth Amendment bars punishment that is excessive in relation to the crime committed. (*Coker v. Georgia* (1977) 433 U.S. 584, 592.) "[A] punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." (*Ibid.*) Defendant rests his argument on the first element. He argues that any sentence in excess of life imprisonment is irrational and serves no legitimate purpose; "a sentence that no human being could conceivably complete serves no rational legislative purpose under either a retributive or a utilitarian theory of punishment." (See *People v. Deloza* (1998) 18 Cal.4th 585, 601 (conc. opn. of Mosk, J.) [criticizing "multicentury sentences"].)

A concurring opinion has "no controlling weight" or precedential value. (*People v. Ceballos* (1974) 12 Cal.3d 470, 483.) Instead, weight must given to the many cases holding that sentences exceeding human life expectancy do not constitute cruel and unusual punishment. (See, e.g., *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382 [115 years plus 444 years to life]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1134-1137 [375 years to life plus 53 years]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666-667 [283 years eight months sentence]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 532 [129 years].) In *Byrd*, the court stated: "In our view, it is immaterial that defendant cannot serve his sentence during his lifetime. In practical effect, he is in no

20

different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life." (*Byrd, supra,* 89 Cal.App.4th at p. 1383.) "[I]mposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*Ibid.*) *Byrd* discerned a legitimate purpose for a sentence in excess of a human life span. A long sentence of this nature "serves valid penological purposes: it unmistakably reflects society's condemnation of defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future." (*Ibid.*) We find that defendant's sentence violates neither the state nor federal ban on cruel and unusual punishment.

## Disposition

Defendant's conviction on count four (§ 288, subd. (c)(1)) is reversed for insufficient evidence and the eight-month determinate term imposed on that count stricken. The trial court is directed to prepare an amended abstract of judgment reflecting this disposition and to forward a certified copy of the amended abstract to the Department of Corrections. In all other respects, the judgment is affirmed.

_____
Pollak, J.

We concur:

_____
McGuiness, P.J.

_____
Siggins, J.